[No. A128172. First Dist., Div. One. Mar. 30, 2011.]

CALIFORNIA MEDICAL ASSOCIATION, Plaintiff and Appellant, v. EDMUND G. BROWN, JR., as Governor, etc., et al., Defendants and Respondents.

## Counsel

Francisco J. Silva, Long X. Do and Lisa Matsubara for Plaintiff and Appellant.

Mennemeier, Glassman & Stroud, Andrew W. Stroud, Margaret Carew Toledo and Kelcie M. Gosling for Defendants and Respondents.

No appearance for Defendant and Respondent John Chiang as State Controller.

## Opinion

**MARCHIANO, P. J.**—The California Medical Association (CMA) contests the legality of a loan made from the Contingent Fund (Contingent Fund) of the Medical Board of California (Medical Board) to the state General Fund to help balance the state's fiscal year 2008–2009 budget. Government Code section 16310 authorizes loans from special funds to the General Fund if the

General Fund is exhausted and the loan does not interfere with the object for which the special fund was created. We conclude that the loan to the General Fund was lawful under this statute, and affirm the denial of CMA's petition for writ of mandate to require that the money be returned to the Contingent Fund.

## I. INTRODUCTION

A. *Factual and Procedural Background*

Item No. 1110-011-0758 of section 2.00 of the Budget Act of 2008 provided for "transfer by the Controller, upon order of the Director of Finance, from the Contingent Fund of the Medical Board of California to the General Fund" the sum of $6 million. (Stats. 2008, ch. 268, § 2.00.) The provision stipulated: "The amount transferred in this item is a loan to the General Fund. This loan shall be repaid with interest calculated at the rate earned by the Pooled Money Investment Account at the time of the transfer. Repayment shall be made so as to ensure that the programs supported by the Contingent Fund of the Medical Board of California are not adversely affected by the loan through reduction in services or through increased fees." (*Ibid.*) The Budget Act of 2008 was signed into law on September 23, 2008, and the money was transferred to the General Fund in October 2008.

In October 2009, the CMA petitioned for a writ of mandate directing that the money be returned, with interest, to the Contingent Fund. The named respondents included Arnold Schwarzenegger, as Governor, John Chiang, as State Controller, and Michael Genest, as Director of the Department of Finance (these respondents or their successors are hereafter referred to collectively as defendants).

The petition states that CMA is "a not-for-profit, professional association of approximately 35,000 physicians and medical students, [which] [f]or more than 150 years . . . has promoted the science and art of medicine, the care and well-being of patients, the protection of the public health, and the betterment of the medical profession. CMA's physician members practice medicine in California in all specialties and settings. They regularly pay biennial license fees to the Medical Board in order to maintain an active license to practice medicine in California. CMA's physician members also are subject to the

jurisdiction of the Medical Board in its enforcement of the laws relating to medical practice and licensing."

The Medical Board is described in the record as "a consumer protection agency responsible for protecting the public through the proper licensing and regulation of California's heath care professionals and the enforcement of the Medical Practice Act. Under the Department of Consumer Affairs . . . it licenses physicians and surgeons . . . , investigates complaints against its licensees, and disciplines those found guilty of violating the law." (See Bus. & Prof. Code, § 2004 [listing Medical Board responsibilities].) Biennial license fees paid by physicians, currently capped at $790, are the Medical Board's primary source of revenue. (See Bus. & Prof. Code, § 2435, subds. (c) & (d).) Those fees and others collected by the Medical Board are credited to its Contingent Fund. (Bus. & Prof. Code, § 2445; see also, e.g., Bus. & Prof. Code, § 2168.4, subd. (e).) Salaries and benefits of all Medical Board employees are paid solely out of the Contingent Fund, and the Medical Board does not rely on money from the state's General Fund for any purpose.

The petition challenged the loan from the Contingent Fund to the General Fund on statutory grounds, and on constitutional grounds that have not been renewed on appeal. Defendants argued that the loan was authorized by statute, and that the petition should also be denied because CMA lacked standing or was guilty of laches.

The court determined that CMA had standing and rejected the laches defense, but found no authority that clearly prohibited the loan, and denied the petition.

B. *Statutory and Fiscal Background*

Defendants contend that the $6 million loan from the Contingent Fund to the General Fund was authorized by Government Code former section 16310, which, in the fall of 2008, provided: "(a) When the General Fund in the Treasury is or will be exhausted, the Controller shall notify the Governor and the Pooled Money Investment Board. The Governor may order the Controller to direct the transfer of all or any part of the moneys not needed in other funds or accounts to the General Fund from those funds or accounts, as determined by the Pooled Money Investment Board, including the Surplus Money Investment Fund or the Pooled Money Investment Account. All moneys so transferred shall be returned to the funds or accounts from which

they were transferred as soon as there are sufficient moneys in the General Fund to return them. No interest shall be charged or paid on any transfer authorized by this section, exclusive of the Pooled Money Investment Account, except as provided herein. This section does not authorize any transfer that will interfere with the object for which a special fund was created or any transfer from the Central Valley Water Project Construction Fund, the Central Valley Water Project Revenue Fund, or the California Water Resources Development Bond Fund." (Stats. 1997, ch. 694, § 6, p. 4755.) The remainder of the statute consisted of a subdivision (b) providing for payment of interest on the money transferred. (Former § 16310.)

CMA contends that the loan from the Contingent Fund to the General Fund was prohibited by Business and Professions Code section 2445, which states: "All moneys paid to and received by the board shall be paid into the State Treasury and shall be credited to the Contingent Fund of the Medical Board of California. Those moneys shall be reported at the beginning of each month, for the month preceding, to the Controller. [¶] The contingent fund shall be for the use of the board and from it shall be paid all salaries and all other expenses necessarily incurred in carrying into effect the provisions of this chapter. [¶] If there is any surplus in these receipts after the board's salaries and expenses are paid, such surplus shall be applied solely to expenses incurred under the provisions of this chapter. No surplus in these receipts shall be deposited in or transferred to the General Fund."

In opposition to the petition, defendants submitted the declaration of Department of Finance (DOF) program budget manager Veronica Chung-Ng, which explained: "Governmental Cost Funds consist of those funds that receive revenues derived from taxes, licenses, and fees. Expenditures of these Governmental Cost Funds represent the cost of operating the State government. There are two major fund types which comprise the Governmental Cost Funds. These two fund types are the General Fund and Special Funds. [¶] The General Fund is the main operating fund of the State, consisting of moneys that are not required by law to be deposited into any other fund." Special funds like the Contingent Fund "are used to account for resources that are legally restricted for particular functions or activities of government."

Chung-Ng further explained that General Fund and special fund cash is deposited into the Pooled Money Investment Account (PMIA). Most special funds are considered to be " 'borrowable' by the General Fund for daily cash flow purposes," and the Contingent Fund was among the special funds listed in a May 2008 report from the State Controller as a "borrowable resource[]" for the General Fund. The State Controller's Office "evaluates the General Fund cash needs" on a daily basis "and determines how much to borrow from the borrowable resources that reside in the PMIA. With certain exceptions,

this borrowing is actually made from the PMIA overall cash balance and not from individual funds/accounts." In contrast to such "cash flow borrowing," the loan at issue was a "budgetary" loan, i.e., a loan that is "specifically authorized in a given year's Budget Act and result[s] in cash being borrowed directly from the special fund."

. In May 2008, the Governor announced that California was grappling with a budget deficit of $17.2 billion, and Chung-Ng noted that "[b]y Fall of 2008, the State was facing a severe fiscal and general fund cash crisis."

In October 2007, the Bureau of State Audits reported that the Contingent Fund had a surplus at the close of its 2006–2007 fiscal year of $18.5 million, a sum sufficient to cover 4.3 months of operating expenditures. By the close of the 2007–2008 fiscal year, the surplus in the Contingent Fund had grown to $23.9 million. Despite deduction of the $6 million loan to the General Fund, a $24.4 million surplus remained at the end of fiscal 2008–2009, an amount that would cover 5.5 months of operations. The Governor's 2010–2011 budget projected Contingent Fund surpluses of $26 million at the end of fiscal 2009–2010, and $23 million at the end of fiscal 2010–2011. In October 2009, the Medical Board projected surpluses of $22.9 million in 2009–2010 and $19.6 million in 2010–2011, covering 5.1 months and 4.3 months of operations, respectively.

Medical Board budget analyst Debbie Titus declared in opposition to CMA's petition that the loan to the General Fund "has had no material effect on the Board's ability to perform its statutory obligations of licensing physicians and surgeons and enforcement of the Medical Practice Act."

Medical Board President Barbara Yaroslavsky declared in support of the petition that the Board "has been informed that the $6 million is anticipated to be returned (in whole or in part) sometime in fiscal year 2010–11, depending upon the level of reserves in state funds." DOF principal program budget analyst Kristin M. Shelton declared in opposition to the petition that "on the basis of the most recent review of this loan, the anticipated repayment timeframe is in the 2012–2013 budget cycle. This timeframe reflects the fact that there are significant reserves and projected reserves in the Contingent Fund."

## II. DISCUSSION

### A. *Scope of Review*

" 'On appeal following a trial court's decision on a petition for a writ of mandate, the reviewing court . . . review[s] questions of law independently.

[Citation.] Where . . . the facts are undisputed and the issue involves statutory interpretation, we exercise our independent judgment and review the matter de novo.' [Citation.]" (*People v. Karriker* (2007) 149 Cal.App.4th 763, 774 [57 Cal.Rptr.3d 412]; see also, e.g., *Kavanaugh v. West Sonoma County Union High School Dist.* (2003) 29 Cal.4th 911, 916 [129 Cal.Rptr.2d 811, 62 P.3d 54].)

B. Daugherty *Decision*

The sole relevant reported case is *Daugherty v. Riley* (1934) 1 Cal.2d 298 [34 P.2d 1005] (*Daugherty*). There, the Legislature had twice appropriated money held in the corporation commission fund of the Division of Corporations for use in the construction of an addition to a state office building. The appropriations were made in 1929 and 1931, when the state had large General Fund surpluses, but by 1934 had left the Division of Corporations in a "deplorable financial condition" (*id.* at p. 302) and unable to pay its expenses. The court invalidated the second appropriation and held that the amount taken remained in the corporation commission fund. (*Id.* at pp. 311–312.)

The first appropriation, for reasons we need not detail, could be deemed to have been for the benefit of the department, but the second could not. The second "appear[ed] to be an appropriation for a capital expenditure chargeable only against the general fund or some other tax or general revenue fund." (*Daugherty, supra*, 1 Cal.2d at p. 308.) The corporation commission fund, consisting of "fees for permits and licenses required by law to be issued as a prerequisite to the initiation or the carrying on of business" (*id.* at p. 303), was "not such a fund. Its revenues are impositions for purposes of regulation only. . . . In this respect the revenues are in the nature of a trust fund raised for a particular purpose in the exercise by the state of its police power. They are not state revenues in the sense that they may be used for any state purpose as long as the department is not in need of them, and the justification for their collection is to make the department self-supporting. . . . Other similar special funds are the board of medical examiner's fund . . . . That these special funds are raised for regulatory purposes and are set apart for the exclusive use of the state departments and agencies for which they are imposed and collected cannot be doubted. That these funds may not be permanently diverted from their specific purposes and to such an extent as to render the department or agency unable to function is likewise clear." (*Id.* at pp. 308–309, citations omitted.)

At the time *Daugherty* was decided, former Political Code section 444, the predecessor statute to Government Code section 16310 (see Historical and Statutory Notes, 33 West's Ann. Gov. Code (2009 ed.) foll. § 16310, p. 31), provided: "The controller must, when either the general fund or the interest

and sinking fund of the state treasury is exhausted, and there is money in some other fund not required to meet any demand which has accrued or may accrue against it, report such fact to the governor and the treasurer. If they find that the money is not needed in such other fund, the governor may order the controller to direct the transfer of such money, or any part thereof, to the general fund or to the interest and sinking fund, as the case may be. All money so transferred must be returned to the fund from which i[t] was transferred as soon as there is sufficient money in the fund to which the transfer was made to return it. Nothing in this section warrants the transfer of any money from any fund so as to in any manner interfere with the object for which such fund was created." (Stats. 1909, ch. 292, § 1, p. 450.)

The *Daugherty* court did not "deny power upon the part of the legislature to transfer a special fund reserve temporarily from one purpose to another under the authority of section 444 of the Political Code or other authority to like effect. But when these diversions are made the transfers are under the section deemed a loan from the special fund to be returned to that fund as soon as funds are available. This right of transfer established by said section 444 is specifically declared not to warrant the transfer of any money from any fund so as to interfere in any manner with the objects for which such fund was created." (*Daugherty, supra*, 1 Cal.2d at p. 309.)

However, "the Appropriation Act of 1931 did not purport to make the transfer as a loan, but it boldly took from the special fund the money necessary for the support and maintenance of the corporation commissioner's department with no provision for its repayment . . . ." (*Daugherty, supra*, 1 Cal.2d at p. 310.) As such, the appropriation violated the special law provision of the California Constitution by effectively imposing a higher general tax burden on payers of corporation commission fees. (*Daugherty, supra*, 1 Cal.2d at p. 310 [applying Cal. Const., art. IV, former § 25, now Cal. Const., art. IV, § 16, subd. (b) ["[a] local or special statute is invalid in any case if a general statute can be made applicable"]; see Historical Notes, 1C West's Ann. Const. (2002 ed.) foll. art. IV, § 16, p. 759.)

In support of this conclusion, the *Daugherty* court cited the importance of the Division of Corporations to the economy of the state. The court observed that "the functioning of the department has become an essential part of the transaction of business involving large corporate enterprises. . . . If the department does not function a paralysis in the business life of the state depending upon its authority to proceed is the inevitable result." (*Daugherty, supra*, 1 Cal.2d at p. 303.) After finding it "clear" that special funds required for "regulatory purposes" could not be "permanently diverted," the court added: "This is especially true in the present case where the legislature has established elaborate governmental machinery the effective operation of

which is essential to the transaction of business depending on its proper functioning. It would appear to be self-evident that the legislature may not on the one hand set up a department to authorize, regulate and supervise business transactions large and small, imposing fees upon those affected for the purpose of carrying out the purposes of the law, and on the other hand permanently divert the funds thus raised and constituting the life blood of the department to a general fund or other general tax purpose." (*Id.* at p. 309.)

▪ The *Daugherty* case is distinguishable from this case because it involved permanent appropriations, when the General Fund had a surplus, that left the agency unable to function, rather than a loan of money not needed for performance of the agency's regulatory responsibilities when the General Fund was exhausted. But the dicta in *Daugherty* about the permissibility of loans under former Political Code section 444, which provided for loans to the General Fund on essentially the same terms as current Government Code section 16310, supports defendants' position. (*Hubbard v. Superior Court* (1997) 66 Cal.App.4th 1163, 1169 [78 Cal.Rptr.2d 819] [Supreme Court dicta should generally be viewed as persuasive authority].)
▪ Subject to the conditions now specified in Government Code section 16310—exhaustion of the General Fund, no interference with the object for which the special fund was created, return of the money as soon as feasible—*Daugherty* indicated that money in special funds could be loaned to shore up the General Fund. (*Daugherty, supra,* 1 Cal.2d at p. 309.) Such loans were lawful notwithstanding the "trust fund" nature of special funds that were collected and segregated for the exclusive use of a regulatory agency. (*Id.* at pp. 308–309.)

## C. *Statutory Arguments*

### (1) *Whether the Statutes Are in Conflict*

CMA argues that Business and Professions Code section 2445 prohibits the $6 million transfer to the General Fund because the statute stipulates that money received by the Medical Board is to be "credited to the Contingent Fund," used only for expenses incurred "under the provisions of this chapter," i.e., the Medical Practice Act (Bus. & Prof. Code, § 2000 et seq.), and not "deposited in or transferred to the General Fund." CMA submits that we must enforce the statute's clear language, and refrain from creating an exception for loans like the one in question. (*People v. Benson* (1998) 18 Cal.4th 24, 30 [74 Cal.Rptr.2d 294, 954 P.2d 557] [no need to construe unambiguous statutory language]; *Stockton Theatres, Inc. v. Palermo* (1956) 47 Cal.2d 469, 476 [304 P.2d 7] [exceptions must in general be specifically stated].)

Defendants counter that the loan was permissible under Government Code section 16310, which allows money "not needed in other funds" to be

transferred to the General Fund if the General Fund "is or will be exhausted," and the transfer will not "interfere with the object for which a special fund was created." Defendants contend that the loan did not undermine the purpose of the Contingent Fund because the fund has had a continuing surplus, and the loan has not interfered with the Medical Board's ongoing operations.

CMA maintains that the loan was prohibited by Government Code section 16310 because it did in fact interfere with objects for which the Contingent Fund was created. CMA acknowledges that one such object is "to provide an account from which the Medical Board draws its operational funds." But CMA identifies other Contingent Fund purposes with which the loan allegedly interfered, such as "ensur[ing] that the State does not misappropriate physician license fees for general state use." The loan also allegedly interfered with the Contingent Fund's "object of . . . present[ing] an accurate measure by which the Medical Board sets physician license fees." When the loan in question was made, the statute specifying those fees provided that the amount of the fees should be set so as to provide the Medical Board with a reserve for approximately two months of operating expenses. (Bus. & Prof. Code, former § 2435, subd. (h), as amended by Stats. 2006, ch. 223, § 21.) The Bureau of State Audits found in October 2007 that the Contingent Fund reserve exceeded the two-month target, and that the reserve "likely will remain above acceptable levels unless fees are reduced or a refund is issued." CMA argues that, by reducing the reserve from which such an adjustment would be calculated, the loan to the General Fund violates what it calls "the right of physicians to reduced fees."

We would grant that the Contingent Fund was created to hold physician license fees, and that the loan at issue could affect the amount of those fees. But it makes no sense to say that a fund has been "created" to set the amount of money to be paid into it, or to prohibit the transfer of money out of it. A fund may be designed with those objects in mind, but they are not reasons for the fund's *existence*. The Contingent Fund exists, broadly speaking, to enable the regulation of California physicians. Because the loan has not hindered performance of the Medical Board's regulatory responsibilities, it has not interfered with the purpose for which the Contingent Fund was "created."

CMA's claim that Government Code section 16310 prohibited the loan rests also on amendments to the statute after the loan was made. In February 2009, subdivisions (c) and (d) of section 16310 were added, which state in relevant part: "(c) Except as described in subdivision (d), all moneys in the State Treasury may be loaned for the purposes described in subdivision (a). [¶] (d) Subdivision (c) shall not apply to any of the following: [¶] . . . [¶] (3) All or part of the moneys not needed in other funds or accounts for pur-

poses of subdivision (a) where the Controller is prohibited by the California Constitution, bond indenture, or statutory or case law from transferring all or any part of those moneys." (Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 9, § 6.)

■ " '[I]n the absence of a clear legislative intent to the contrary statutory enactments apply prospectively' " (*Strauss v. Horton* (2009) 46 Cal.4th 364, 470 [93 Cal.Rptr.3d 591, 207 P.3d 48]), and the legislative history in this instance indicates that no retroactive application was intended. The legislation originated in an Assembly Bill which when first introduced stated that it was "the intent of the Legislature to enact statutory changes relating to the Budget Act of 2008." (Assem. Bill No. 3X 13 (2009–2010 3d Ex. Sess.) as introduced Jan. 5, 2009.) However, this language, which might have suggested an intent to have the legislation apply to the loan in question, was deleted before the bill was enacted. (Assem. Bill No. 3X 13 (2009–2010 3d Ex. Sess.) as amended Feb. 14, 2009.) Therefore, we are not called upon to decide whether the loan would have been lawful under the current version of Government Code section 16310.

CMA does not argue that the 2009 amendments operate retroactively, but submits new subdivision (d)(3) of Government Code section 16310 "help[s] illuminate the overall intent behind" the statute, and "clarifies that the statute squarely prohibits any loans from the Contingent Fund." But if the statute already accomplished the result CMA advocates, nothing further was required to provide for it. Consequently, the addition of subdivision (d)(3) is of no assistance to CMA.

Accordingly, Government Code section 16310 and Business and Professions Code section 2445 are in apparent conflict as to the loan. Government Code section 16310 authorized the loan because the state faced exhaustion of the General Fund in a fiscal emergency, and the loan did not impede the Medical Board from performing its regulatory responsibilities. On the other hand, Business and Professions Code section 2445 arguably prohibited the loan because it precluded money in the Contingent Fund from being transferred by budgetary legerdemain to the General Fund, or used for purposes unrelated to the Medical Practice Act.

(2) *Whether the Statutes Can Be Harmonized*

■ CMA correctly contends Business and Professions Code section 2445 is a more specific statute than Government Code section 16310. Whereas Government Code section 16310 applies broadly to all "funds or accounts"

other than the General Fund, Business and Professions Code section 2445 applies only to the Contingent Fund. CMA argues that Business and Professions Code section 2445 must therefore prevail under "the well-established rule of statutory construction[ that] a specific statute controls over a general statute covering the same subject." (*Shewry v. Wooten* (2009) 172 Cal.App.4th 741, 747 [91 Cal.Rptr.3d 199].) However, " '[t]he principle that a specific statute prevails over a general one applies only when the two sections cannot be reconciled. . . . .' If we can reasonably harmonize '[t]wo statutes dealing with the same subject,' then we must give 'concurrent effect' to both, 'even though one is specific and the other general. . . .' " (*Garcia v. McCutchen* (1997) 16 Cal.4th 469, 478 [66 Cal.Rptr.2d 319, 940 P.2d 906], citations omitted; see also, e.g., *Royalty Carpet Mills, Inc. v. City of Irvine* (2005) 125 Cal.App.4th 1110, 1118 [23 Cal.Rptr.3d 282].)

The Business and Professions Code section 2445 prohibition against transfer of a Contingent Fund surplus to the General Fund can be harmonized with Government Code section 16310 by construing that prohibition to apply only to permanent transfers and not those that are merely loaned and thereby transferred temporarily. A loan and an outright appropriation are both "transfers," and Business and Professions Code section 2445 could equally refer to either. The rule that statutes must be harmonized if reasonably possible requires that the prohibited transfers be construed to refer to permanent appropriations rather than loans in the context of the issues in this case.

This interpretation also reasonably reconciles Government Code section 16310 with Business and Professions Code section 2445's directive that the Contingent Fund surplus be applied solely to expenses incurred under the Medical Practice Act. A loan to the General Fund results in only temporary use of the surplus for purposes unrelated to the Medical Board's function. Under the terms of the budgetary loan and Government Code section 16310, the money will ultimately be returned to the Contingent Fund, with interest, for use under the Medical Practice Act. Our conclusion that the statutes can be harmonized in this manner is consistent with the *Daugherty* dicta allowing loans to the General Fund under former Political Code section 444 notwithstanding the "trust fund" nature of special funds and their segregation for regulatory purposes. (*Daugherty, supra*, 1 Cal.2d at pp. 308–309.)

### (3) *Other Statutes Bearing on the Issue*

Defendants' position is strengthened when we look at statutes that pertain to funds other than the Contingent Fund that expressly prohibit loans, as well as transfers, to the General Fund under Government Code section 16310. Government Code section 16429.3 states "[m]oneys placed with the Treasurer for deposit in the Local Agency Investment Fund by cities,

counties, special districts, nonprofit corporations, or qualified quasi-governmental agencies shall not be subject to . . . [¶] (a) Transfer or loan pursuant to Section[] 16310 . . . ." Government Code section 99009 states that "[m]oneys held in the Fiscal Recovery Fund may not be borrowed by, or available for transfer to, the General Fund pursuant to Section 16310 . . . ." The Legislature's failure to provide similarly against both loans and transfers in Business and Professions Code section 2445 implies that loans are permitted. "It is a settled rule of statutory construction that when the Legislature uses a particular word or phrase in one statute, the omission of that word or phrase in another statute dealing with the same general subject matter shows a different legislative intent." (*Doe v. Saenz* (2006) 140 Cal.App.4th 960, 984 [45 Cal.Rptr.3d 126].)

CMA maintains that it is "misleading" to compare Government Code sections 16429.3 and 99009 with Business and Professions Code section 2445. CMA finds it "not surprising" that those Government Code sections would refer to Government Code section 16310, because the latter statute, which was enacted in 1945, had "long [been] on the books" when references to it were included in the other statutes in 1996 and 2003. (Stats. 1945, ch. 120, § 1, pp. 514, 516 [Gov. Code, § 16310]; Stats. 1996, ch. 833, § 8, p. 4415 [Gov. Code, § 16429.3]; Stats. 2003, 1st Ex. Sess. 2003–2004, ch. 13, § 2, p. 7033 [Gov. Code, § 99009].) But CMA submits that because Government Code section 16310 "did not exist" when Business and Professions Code former section 2454, a predecessor statute to current Business and Professions Code section 2445, was enacted in 1937, Business and Professions Code former section 2454 "could [not] have . . . refer[red] to it." (Stats. 1937, ch. 399, pp. 1230, 1281; Stats. 1937, ch. 414, § 3, p. 1377 [Bus. & Prof. Code, former § 2454]; see Historical and Statutory Notes, 3A pt. 2 West's Ann. Bus. & Prof. Code (2003 ed.) foll. § 2445, p. 546.)

But this argument is itself misleading when one looks at the history of Government Code section 16310. When Government Code section 16310 was enacted in 1945, it incorporated the provisions of former Political Code section 444, which had been on the books since 1907, without any substantive change. (Stats. 1907, ch. 312, § 1, p. 582; compare Stats. 1909, ch. 292, § 1, p. 450 with Stats. 1945, ch. 120, § 1, pp. 514, 516.) Since former Political Code section 444 had authorized loans to the General Fund on essentially the same terms as Government Code former and current section 16310 for 30 years before Business and Professions Code former section 2454 was enacted, a prohibition against such loans could have been included in the latter statute, when it was enacted, if the Legislature intended to prohibit them. However, language prohibiting transfers from the Contingent Fund was not added to the statute until 1975, and loans from the Contingent Fund have never been expressly prohibited. (Stats. 1975, 2d Ex. Sess. 1975–1976, ch. 1, §§ 24, 24.05, pp. 3965–3966 [amending Bus. & Prof.

Code, former §§ 2454, 2456].) Government Code sections 16429.3 and 99009 therefore support our conclusion.

CMA seeks support for its position in Government Code section 16320, which provides in relevant part: "(a) Unless otherwise prohibited by law, moneys in the State Treasury may be loaned from one state fund or account to any other state fund or account to address the 2001–02, 2002–03, and 2003–04 fiscal year budgetary shortfalls, subject to all of the following conditions: [¶] (1) The loan is authorized in the 2002 Budget Act, legislation enacted in a 2003–04 Extraordinary Session, or the 2003 Budget Act. [¶] (2) The terms and conditions of the loan, including an interest rate, are set forth in the loan authorization. [¶] (3) The loan is considered part of the balance of the fund or account that received the funds for the purpose of accounting and budgeting, including any determination [of the General Fund balance] made pursuant to Section 13307. [¶] (4) The loan is not deducted from the balance of the fund or account from which the loan is made for purposes of calculating a fee or assessment. [¶] (5) A fee or assessment is not increased as a result of a loan. [¶] (6) Moneys loaned under this section are not considered a transfer of resources for purposes of determining the legality of the use of those moneys by the fund or account from which the loan is made or the fund or account that received the loan. [¶] (b)(1) . . . [T]he Director of Finance shall order the repayment of all or a portion of any [loan made pursuant to subdivision (a)] if he or she determines that either of the following circumstances exists: [¶] (A) The fund or account from which the loan was made has a need for the moneys. [¶] (B) There is no longer a need for the moneys in the fund or account that received the loan."

CMA contends the loan from the Contingent Fund would "probably" have been lawful if it had been made subject to the conditions set forth in Government Code section 16320, but observes that the statute does not cover the fiscal year involved here. However, it does not follow that, because the loan could have been authorized under the terms of Government Code section 16320, it is necessarily prohibited by Government Code section 16310. The issue is whether Government Code section 16310 can be harmonized with Business and Professions Code section 2445, and it is irrelevant that the task might have been easier if we were applying a different statute.

(4) *Administrative Construction*

The Contingent Fund was deemed by the State Controller's May 2008 compilation of special funds to be "borrowable" by the General Fund. The list included approximately 100 special funds with total borrowable resources of approximately $9.1 billion as of March 2008. The State Controller's report cited Government Code section 16310 as the legal authority for budgetary

loans such as the one at issue, as well as the daily cashflow loans described in the declaration of DOF program budget manager Chung-Ng. Although statutory interpretation is ultimately a judicial function, "[a]n 'administrative interpretation . . . will be accorded great respect by the courts and will be followed if not clearly erroneous. . . .' " (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7 [78 Cal.Rptr.2d 1, 960 P.2d 1031].) For the reasons previously stated, the State Controller's interpretation of Government Code section 16310 of the funds available to his office for borrowing cannot be characterized as clearly erroneous. The rule favoring the construction of a statute by those charged with its administration lends support to defendants' position here. (*La Fe, Inc. v. County of Los Angeles* (1999) 73 Cal.App.4th 231, 240 [86 Cal.Rptr.2d 217].)

### (5) *Policy Arguments*

CMA submits that loans like the one from the Contingent Fund are bad policy, based primarily on a 2005 report critical of such loans by the staff of the Senate Joint Committee on Boards, Commissions and Consumer Protection entitled "$200 Million in Taxes or $200 Million in Loans?: Cross-cutting Issue for All Boards Under the Department of Consumer Affairs."[1] The report questioned among other things whether loans to the General Fund during the 2002–2003 and 2003–2004 fiscal years from boards within the Department of Consumer Affairs "[could] jeopardize board operations essential to public safety."

■ Although we must be mindful of the "consequences that will flow" from our interpretation of Government Code section 16310 (*Hospital Committee For Livermore-Pleasanton Areas v. City of Oakland* (2009) 176 Cal.App.4th 1360, 1375 [99 Cal.Rptr.3d 29]), "[i]t is not our province to weigh the desirability of the social or economic policy underlying the statute or to question its wisdom; they are purely legislative matters" (*Allied Properties v. Dept. of Alcoholic Beverage Control* (1959) 53 Cal.2d 141, 146 [346 P.2d 737]; see also, e.g., *Larry Menke, Inc. v. DaimlerChrysler Motors Co., LLC* (2009) 171 Cal.App.4th 1088, 1093 [90 Cal.Rptr.3d 389]). The policy concerns expressed in the committee report are thus for the Legislature and not this court.

In any event, no evidence indicates that the loan in question has compromised the Medical Board's regulatory mission, or suggests that the Legislature is unconcerned with the loan's effect on the Medical Board's operations. To the contrary, the Legislature has called upon the Office of State Audits and

---

[1] See Web site of the Senate joint committee at <http://www.sen.ca.gov/ftp/SEN/COMMITTEE/JOINT/SUNSET_REVIEW/_home/pubs.htp> (link to "2005 Crosscutting Issues") (as of Mar. 30, 2011).

Evaluations to complete, by June 2012, a review of the Medical Board's financial status, including "projections related to expenses, revenues, and reserves, and the impact of the loan from the Contingent Fund of the Medical Board of California to the General Fund made pursuant to the Budget Act of 2008." (Bus. & Prof. Code, § 2435, subd. (i).)

CMA goes so far as to speculate that the loan may contribute to a shortage of doctors in the state. CMA notes that the October 2007 audit of the Medical Board found an $18.5 million Contingent Fund surplus, an "excess in fund balance [that] represent[ed] approximately $88 per licensed physician." The record shows that the surplus has increased since that time, and the surplus would be even greater but for the $6 million loan to the General Fund. But even if physicians are now paying twice the amount of excess fees that they were in 2007 by virtue of the General Fund loan, we doubt that the $88 charge would cause them to flee the state, and no evidence suggests that it has done so.

(6) *Conclusion*

■ To recapitulate, we have determined that Government Code section 16310 can be harmonized with Business and Professions Code section 2445 to permit the loan in question, that other statutes and the administrative construction of Government Code section 16310 support that statute's application here, and that CMA's policy arguments are unpersuasive; the loan, in short, was lawful under Government Code section 16310.[2]

■ In the final analysis, our task is to effectuate " 'the apparent purpose and intention of the lawmakers . . . .' " (*Watershed Enforcers v. Department of Water Resources* (2010) 185 Cal.App.4th 969, 979 [110 Cal.Rptr.3d 876].) We must moreover apply "reason, practicality, and common sense" to the language of the statutes, interpreting the words in such a way as to "make them workable and reasonable . . . ." (*Halbert's Lumber, Inc. v. Lucky Stores, Inc.* (1992) 6 Cal.App.4th 1233, 1239 [8 Cal.Rptr.2d 298].) The *Daugherty* court rendered a reasonable and practical decision decades ago in another time of fiscal crisis when it refused to permit, by means of a budgetary appropriation, the financial dismantling of an agency that was necessary to the economic functioning of the state. In upholding the budgetary loan in this case, we are carrying out what we discern to be the legislative intent, and reaching a reasonable and practical result that gives the state flexibility to balance its budget in a manner that does not stymie beneficial regulation.

---

[2] In view of that conclusion, we need not reach defendants' arguments regarding standing and laches.

## III. DISPOSITION

The judgment denying the petition for writ of mandate is affirmed.

Margulies, J., and Dondero, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 22, 2011, S192936.