Filed 5/13/15 Unmodified opinion attached

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| GOLDEN STATE WATER COMPANY,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>CASITAS MUNICIPAL WATER DISTRICT et al.,<br><br>    Defendants and Respondents. | 2d Civil No. B255408<br>(Super. Ct. No. 56-2013-00433986-<br>CU-WM-VTA)<br>(Ventura County)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered the opinion filed on April 14, 2015, be modified as follows:

On page 1, the first paragraph and the first sentence of the second paragraph are deleted. In the second sentence of the second paragraph, a hyphen is inserted between "sky" and "high".

On page 4, last paragraph, in the sixth and seventh lines, the phrase "the issue" is replaced with "Golden State's standing".

On page 6, second paragraph, in the ninth line the phrase "compulsory purchase" is de-italicized.

On page 8, second full paragraph, in the fourth and fifth lines the phrase "which does not directly affect the jurisdiction of the legislative body to order the installation of the facility or the provision of service" is de-italicized and, in the sixth and seventh lines, the citation "(*Ibid.*, italics added.)" is replaced with "(*Ibid.*)".

On page 11, second full paragraph, in the fifth line the phrase "entire bill" is de-italicized and, in the last line, "fn. 2" is replaced with "fn. 2, italics omitted".

On pages 14-15, the paragraph following "*Conclusion*" is replaced with the following:

Golden State advocates for a rule that would shift the bargaining power decisively in its favor. "While an interesting conversation might be had about whether this was reasonable or wise, we can find no room for arguing" it as a matter of statutory interpretation. (*Capistrano Taxpayers Association, Inc. v. City of San Juan Capistrano* (Apr. 20, 2015, G048969) __ Cal.App.4th __ [2015 WL 1798898, *8].) Like the trial court, we will not set aside the lawfully expressed will of the voters.[7]

[There is no change in the judgment.]

Golden State Water Company's petition for rehearing is denied.

Filed 4/14/15 Unmodified opinion

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| GOLDEN STATE WATER COMPANY,<br><br>  Plaintiff and Appellant,<br><br>v.<br><br>CASITAS MUNICIPAL WATER DISTRICT et al.,<br><br>  Defendants and Respondents. | 2d Civil No. B255408<br>(Super. Ct. No. 56-2013-00433986-<br>CU-WM-VTA)<br>(Ventura County) |

Monopolists have long been unpopular in this country. When King George III's choke hold on government led to intolerable levels of taxation, he was forced to divest his holdings. At the end of the nineteenth century, Congress passed the Sherman Antitrust Act with only a single dissenting vote. (26 Stat. 209, as amended, 15 U.S.C. §§ 1-7.) Introducing his landmark bill, Senator Sherman summed up the prevailing sentiment: "If we will not endure a king as a political power we should not endure a king over the production, transportation, and sale of any of the necessaries of life." (21 Cong. Rec. 2457 (1890).)

Nothing is more necessary to life than water. Residents of Ojai, fed up with sky high water bills, voted to oust appellant Golden State Water Company (Golden State), the private utility that monopolizes water service to their city, and replace it with respondent Casitas Municipal Water District (Casitas), a municipal utility that they hope will be more responsive to their concerns. They plan to finance this transaction by selling

bonds pursuant to the Mello-Roos Community Facilities Act of 1982 (Mello-Roos Act or Act). (Gov. Code, § 53311 et seq.)[1]

Golden State is unwilling to sell its business. Casitas therefore plans to acquire the assets by eminent domain. Golden State contends that the Mello-Roos Act cannot be used to finance eminent domain actions or to acquire intangible property. We disagree. The Act facilitates the purchase of property regardless of whether the seller consents to the sale or is compelled under force of law. Moreover, financing the acquisition of intangible property incidental to the real or tangible property being purchased is consistent with the Act's text and purpose. Accordingly, we affirm.

FACTS AND PROCEDURAL HISTORY

Casitas is a publicly owned water utility encompassing 140 square miles in western Ventura County. Its territory includes the City of Ojai, but for historical reasons most of Ojai and some adjacent areas receive water from Golden State. Golden State charges its customers rates that are more than double those charged by Casitas, and the disparity is growing. Over a 20-year period, Golden State's average annual rate increase was nearly twice that of Casitas.

After several failed attempts to redress their grievances with the Public Utilities Commission (PUC), Golden State's regulatory agency, local residents formed respondent Ojai Friends for Locally Owned Water (Ojai FLOW), an interest group "with the intent to declare independence from the economic tyranny of Golden State." Ojai FLOW, supported by Ojai's city council and more than 1,900 registered voters, petitioned Casitas to take over Golden State's water service in Ojai.

Casitas concluded that the Ojai community would benefit from having its water utility run by a locally controlled entity rather than an out-of-area corporation seeking to maximize profits for its owners. Casitas's board members live in the community and its customers have the right to participate in management decisions. Unlike Golden State, Casitas is subject to the Brown Act (§ 54950 et seq.) and the

---

[1] All further statutory references are to the Government Code unless otherwise stated.

2

California Public Records Act (§ 6250 et seq.), and its meetings are conducted in public within its service area. Under Proposition 218 (Cal. Const., art. XIII D), Casitas's rates can be reduced by a majority of voters in its service area. (*Bighorn-Desert View Water Agency v. Verjil* (2006) 39 Cal.4th 205, 217.) The only recourse for Golden State's customers is to contend with the formal PUC process involving officials and staff located hundreds of miles away, whereas Casitas's customers can express their wishes at the local level.

Casitas determined that the Mello-Roos Act would be an appropriate means of financing the transaction in light of its objective to place the financial burden on Ojai residents rather than on its existing water customers. Pursuant to the Act, Casitas formed a community facilities district, respondent Casitas Municipal Water District Community Facilities District No. 2013-1 (Ojai) (Casitas CFD). Casitas passed resolutions listing the facilities to be acquired, declaring the necessity of raising bond revenue to finance their acquisition, and submitting the matter to voters for their approval in a special election. The ballot measure asked voters to authorize Casitas CFD to issue up to $60 million in bonds "to finance the acquisition of [Golden State's] property and property rights" in Ojai. To pay for the bonds, a special tax would be levied on property in Casitas CFD.

Golden State filed a reverse validation complaint and petition for writ of mandate (Code Civ. Proc., §§ 860 et seq., 1085) seeking to invalidate and set aside Casitas's resolutions. The trial court stayed the case until after the vote. At the single-issue special election that drew in more than half of eligible voters, 87 percent of the electorate approved the measure. The trial court subsequently ruled against Golden State on all issues and entered judgment in favor of respondents.

Golden State contends that the Mello-Roos Act cannot be used to finance a taking of property by eminent domain or the acquisition of intangible property and property rights. In addition, it contends that the Act cannot be used by one service provider to supplant another service provider using the same facilities and serving the same customers. We review these issues of statutory construction de novo. (*Ceja v. Rudolph & Sletten, Inc.* (2013) 56 Cal.4th 1113, 1119.)

3

## *Standing*

Golden State concedes that Casitas may lawfully exercise the power of eminent domain (Wat. Code, § 71693) but asserts that "Mello-Roos is not the only way to finance property acquisition." Golden State is "sure that [Casitas] can come up with other alternatives." For example, Golden State suggests that Casitas could issue revenue bonds (*id.* § 71853) or form an improvement district to issue bonds (*id.* § 71870). Respondents dispute this assertion, arguing that "Mello-Roos financing is the only viable 'tool for the job'" and that other methods are impractical.

If Golden State is correct that respondents have alternative ways to finance the transaction that are both legal and practical, then the injury it complains of—the imminent taking of its assets—does not turn on the resolution of this lawsuit. If that were the case, Golden State would lack standing to pursue this action. (See *City of Santa Monica v. Stewart* (2005) 126 Cal.App.4th 43, 59 ["A party lacks standing if it does not have an actual and substantial interest in, or would not be benefited or harmed by, the ultimate outcome of an action"]; cf. *Wilson & Wilson v. City Council of Redwood City* (2011) 191 Cal.App.4th 1559, 1582-1584 [suit for declaratory relief to protect plaintiff's property from possible future condemnation based on city's statement that it would "use its best efforts and legally available means to acquire [it]" did not present live controversy].)

Although we can evaluate the legality of alternative financing methods, the trial court first would have to assess their feasibility. (*People v. Superior Court (Plascencia)* (2002) 103 Cal.App.4th 409, 415 [trier of fact must conduct evidentiary hearing when "resolution of the question of standing turn[s] upon disputed issues of material fact"].) We will not remand to the trial court to make the factual determination on which Golden State's standing turns, however, because respondents do not contest the issue (see *Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1240 & fn. 2), because addressing the merits is in the public interest (see *California Water & Telephone Co. v. County of Los Angeles* (1967) 253 Cal.App.2d 16, 26), and

4

because we can resolve the appeal more easily by reaching the merits (see *California Medical Assn. v. Brown* (2011) 193 Cal.App.4th 1449, 1465 & fn. 2).

*Mello-Roos Financing for Eminent Domain Acquisitions*

"When construing a statute, our objective 'is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute.' [Citation.] We look first to the words of the statute, '"because they generally provide the most reliable indicator of legislative intent.' [Citation.] We give the words their usual and ordinary meaning [citation], while construing them in light of the statute as a whole and the statute's purpose [citation]." [Citation.] "'If there is no ambiguity in the language, we presume the Legislature meant what it said and the plain meaning of the statute governs.' [Citation.] 'Only when the statute's language is ambiguous or susceptible of more than one reasonable interpretation, may the court turn to extrinsic aids to assist in interpretation.'"' [Citation.]" (*Ceja v. Rudolph & Sletten, Inc.*, *supra*, 56 Cal.4th at p. 1119.)

The Mello-Roos Act "provides an alternative method of financing certain public capital facilities and services." (§ 53311.5.) Although it was designed for use "especially in developing areas and areas undergoing rehabilitation" (*ibid.*), it is not limited to such contexts.

Any "local agency"—defined as "any city or county . . . , special district, school district, joint powers entity . . . , redevelopment agency, or any other municipal corporation, district, or political subdivision of the state" (§ 53317, subd. (h))—may use Mello-Roos financing. The process is straightforward. The local agency's legislative body or governing board first establishes a "community facilities district" whose sole purpose is to finance authorized "facilities" and "services." (§§ 53317, subds. (b), (g), 53318-53325.1.) Subject to approval by two-thirds of district voters, the district may issue bonds to finance facilities (but not services) (§§ 53345-53355) and the local agency may levy and collect a special tax on real property in the district to pay for the bonds or to finance facilities and services directly (§§ 53328, 53340, 53345.3). (See *Azusa Land Partners v. Department of Indus. Relations* (2010) 191 Cal.App.4th 1, 18.)

5

With respect to "facilities," the Act authorizes a community facilities district to "finance the purchase, construction, expansion, improvement, or rehabilitation of any real or other tangible property with an estimated useful life of five years or longer or [to] finance planning and design work that is directly related to the purchase, construction, expansion, or rehabilitation of any real or tangible property."  (§ 53313.5.) The issue here is whether a "purchase" must be voluntary for both parties or whether the term includes compensation for facilities acquired by the local agency through its eminent domain power.  We conclude that the latter construction of the statute is more plausible and better effectuates the drafters' intent.

The word "purchase" connotes acquisition, often in exchange for compensation, regardless of whether the thing being acquired is relinquished voluntarily. (See Black's Law Dict. (9th ed. 2009) p. 1354, col. 2 [defining "purchase" as either "an instance of buying" or [t]he acquisition of real property by one's own or another's act (as by will or gift) rather than by descent or inheritance"]; Merriam-Webster's Collegiate Dict. (10th ed. 1999) p. 948, col. 2 [defining "purchase" as "acquir[ing] (real estate) by means other than descent or inheritance," "obtain[ing] by paying money or its equivalent," or "obtain[ing] by labor, danger, or sacrifice"].)  For this reason, eminent domain is sometimes referred to as "*compulsory purchase*."  (Black's Law Dict., *supra*, at p. 601, col. 1.)  When a public entity condemns property, it must pay the owner the same price the owner would receive from a private party purchasing the property in an arm's length transaction.  (*Saratoga Fire Protection Dist. v. Hackett* (2002) 97 Cal.App.4th 895, 902 ["The measure of compensation provided by the eminent domain law is the 'fair market value' . . . defined as the highest price on the date of valuation that would be agreed to by a willing seller, under no obligation nor necessity to sell, and a willing buyer, under no similar obligation or necessity to buy, each dealing with the other with full knowledge of all the uses and purposes for which the property is reasonably adaptable and available"].)

Our Supreme Court has addressed a similar issue of statutory construction. The statute at issue in *People v. Superior Court* (1937) 10 Cal.2d 288 provided for a

6

special commission that would "purchase or acquire[] farm lands by unconditional gift or use of lands owned by the state" in order to construct a state prison facility. (Stats. 1935, ch. 414.) The Supreme Court concluded that this language was "sufficient to legally authorize the special commission to condemn land."[2] (*People v. Superior Court*, *supra*, 10 Cal.2d at p. 291.)

In light of the statute's purpose of acquiring land for governmental purposes, the "average citizen" would realize that, after the special commission selected "the most desirable site, for any one of various reasons the owner thereof might be averse either to the sale or other disposition of his property even for ordinary uses." (*People v. Superior Court, supra*, 10 Cal.2d at pp. 292, 293; accord, Posner, Economic Analysis of the Law (2d ed. 1977) p. 40 ["Once the railroad or pipeline has begun to build its line, the cost of abandoning it for an alternative route becomes very high. Knowing this, people owning land in the path of the advancing line will be tempted to hold out for a very high price—a price in excess of the actual opportunity cost of the land"].) The average citizen would further assume that "the only means by which [the government] might accomplish its purpose in that regard would be . . . by an action in the exercise of the right of eminent domain." (*People v. Superior Court, supra,* at p. 293.) Thus, the statutory language would not "deceive, mislead or defraud [the general public] concerning the authority of the state to condemn any suitable property" to construct the prison. (*Id.* at pp. 293-294.)

Moreover, the statutory power to "purchase" lands "imports authority not only to acquire lands by bargain and sale agreement for their agreed cash value, by possible exchange of some previously-owned land by the state for other land that might be more suitable for prison purposes, or even by the means that was adopted and sought to be made effective herein, to wit: by means of an action in the exercise of the right of eminent domain. In other words, that the word 'purchase' is broad enough to include

---

[2] The statute specifically authorized the special commission to institute eminent domain proceedings. The issue was whether the statute's title, providing for the "purchase or acquirement of farm lands by unconditional gift," violated the one-subject rule (Cal. Const., art. IV, former § 24, now § 9) by failing to mention the subject of eminent domain. (*People v. Superior Court*, *supra*, 10 Cal.2d at p. 291.)

7

within its meaning any means other than by descent." (*People v. Superior Court*, *supra*, 10 Cal.2d at p. 294.)

This logic applies here with equal force. The Mello-Roos Act, like the prison statute, authorizes a public agency to "purchase" real property in order to construct and develop government facilities. Given the obvious practical need in certain circumstances of using eminent domain power to acquire property for this purpose, the word "purchase" should be construed in its broadest sense, which includes a taking by eminent domain in exchange for just compensation. (See *People ex rel. S. F. Bay Etc. Com. v. Town of Emeryville* (1968) 69 Cal.2d 533, 543-544 [" '[W]here a word of common usage has more than one meaning, the one which will best attain the purposes of the statute should be adopted, even though the ordinary meaning of the word is thereby enlarged or restricted and especially in order to avoid absurdity or to prevent injustice' "].)

Lest there be any doubt, the Act provides that it "shall be liberally construed in order to effectuate its purposes." (§ 53315.) It continues: "No error, irregularity, informality, and no neglect or omission of any officer, in any procedure taken under [the Act], *which does not directly affect the jurisdiction of the legislative body to order the installation of the facility or the provision of service*, shall void or invalidate such proceeding or any levy for the costs of such facility or service." (*Ibid.*, italics added.) Put differently, if the public agency otherwise has the power to acquire the facilities, the Mello-Roos Act should not be interpreted to preclude financing them. (Cf. § 53312.5 ["The local agency may take any actions or make any determinations which it determines are necessary or convenient to carry out the purposes of [the Act] and which are not otherwise prohibited by law"].)

Golden State argues against a liberal construction of the term "purchase" because the Act involves taxation. It asserts that a community facilities district "is a mere *taxing district*, not a separate municipal entity," and as such "the power of special taxation is restricted to and can extend no further than the plain language of the legislative enactment upon which it is based." (*Mulville v. City of San Diego* (1920) 183

8

Cal. 734, 740.)  Whatever the force of this rule after the recent constitutional changes limiting the government's ability to impose and increase taxes (see Cal. Const., arts. XIII A, XIII C, XIII D), the Act's plain language instructs us to construe the power of taxation liberally so long as it is approved by the requisite supermajority of voters. "'[D]ue respect for the political branches of our government requires us to interpret the laws in accordance with the expressed intention of the Legislature. . . .'" (*Professional Engineers in California Government v. Brown* (2014) 229 Cal.App.4th 861, 872-873; see *Galbiso v. Orosi Public Utility Dist.* (2010) 182 Cal.App.4th 652, 665 [liberally construing statute with similar purpose and virtually identical construction clause].)

Citing various statutes that list "purchase" and "eminent domain" in the disjunctive as two ways by which to acquire property, Golden State asserts that there would be no reason to do so if the former term included the latter.  In some contexts, this is undoubtedly true.[3]  In others, it is not.  (See *In re Jesusa V.* (2004) 32 Cal.4th 588, 622-623 [Although the word "or" normally "has a disjunctive meaning," it "may have a conjunctive meaning" if "such construction is found necessary to carry out the obvious intent of the Legislature in a statute"].)  Statutes intended to define a concept expansively often list terms with overlapping meanings separated by the word "or."  (See, e.g., *Amberger-Warren v. City of Piedmont* (2006) 143 Cal.App.4th 1074, 1081-1082.)  For example, a community rehabilitation district may "[a]cquire real or personal property of every kind within the district, by grant, purchase, gift, devise, lease, or eminent domain." (§ 53382.)  These terms are not mutually exclusive.  "Grant" is a generic term for a conveyance.  (26A C.J.S. Deeds, § 5 (2015).)  A gift is a grant without consideration. (38A C.J.S. Gifts, § 8 (2015).)  A devise is a grant or gift contained in a will.  (97 C.J.S.

---

[3] The Eminent Domain Law states that "[w]hether property necessary for public use is to be acquired *by purchase or other means or by eminent domain* is a [discretionary] decision . . . ."  (Code. Civ. Proc., § 1230.030, italics added.)  On its face, the phrase "or by eminent domain" is superfluous.  The preceding phrase, "by purchase or other means," necessarily covers all possible modes of acquisition.  The Legislature likely intended the phrase "or other means" in the sense of "or other means besides eminent domain," which just goes to show that context matters.

Wills, § 1919 (2015).)  A lease is yet another type of grant.  (See 52 C.J.S. Landlord & Tenant, § 1 (2015).)

Throughout the Mello-Roos Act, the terms "purchase" and "acquisition" are used interchangeably.  (E.g., §§ 53313.4 [providing fee exemption for "[a]ny territory within a community facilities district established for the acquisition or improvement of school facilities for a school district"], 53313.5, subd. (f) ["The district may also finance the acquisition, improvement, rehabilitation, or maintenance of any real or other tangible property . . . for flood and storm protection services"], 53314 [authorizing legislative body to transfer money for "expenses incurred by reason of the construction or acquisition of any facilities or provision of any authorized services within the district"].)  The Act is not unique in this usage.  Other statutes use "purchase" in the sense of "acquire"—including by eminent domain—more explicitly.  (See, e.g., Civ. Code, § 798.80, subd. (e)(7) [providing that "[t]he purchase of a mobilehome park by a governmental entity under its powers of eminent domain" exempts park owner from notifying homeowners association of intent to sell]; *id.* at § 800.100, subd. (e)(7) [same for owner of floating home marina]; Ed. Code, § 19957.5 ["The terms 'purchase of land' or 'acquisition of land' . . . shall include, but shall not be limited to, the acquisition of land by eminent domain"].)

Golden State points out that the Legislature considered including the term "eminent domain" in an early draft of the Act and argues that its ultimate exclusion signals an intent to prohibit this mode of acquisition.  It is true that, "[a]s a general principle, the Legislature's rejection of specific language constitutes persuasive evidence a statute should not be interpreted to include the omitted language.  [Citation.]"  (*Doe v. Saenz* (2006) 140 Cal.App.4th 960, 985.)  That principle, however, has no application here.

The bill, as originally drafted, would have amended the Streets and Highways Code to authorize local agencies to create a new type of assessment district.  Borrowing language from another assessment district statute (Sts. & Hy. Code, § 5023.1), the original bill defined "acquisition" to mean, among other things, "[a]ny real property,

10

rights-of-way, easements, or interests in real property, acquired or to be acquired by gifts, purchase, or eminent domain, and which are necessary or convenient in connection with the construction or operation of any facility or the provision of any service authorized . . . ." This definition generated no comment or criticism.

The bill nonetheless faced substantial opposition for an unrelated reason: it was seen as an attempt to circumvent the requirement in Proposition 13 that any new special taxes receive approval by two-thirds of voters. (Cal. Const., art. XIII A, § 4.) The Legislative Counsel expressed concern that the bill "may be determined by the courts to authorize a special tax" because it would have allowed an assessment district to authorize, upon a majority vote, assessments for purposes such as "police and fire protection facilities, libraries, [and] park and recreation facilities." These facilities "historically [had] been supported by property tax revenues." The California Chamber of Commerce, the California Taxpayers' Association, the California Association of Realtors, and others expressed similar views that the bill as drafted was unconstitutional.

In response, the bill's authors "completely changed" the legislation. In the revised bill, the definition of "acquisition" was dropped altogether. The word "purchase" did not appear at first either. Instead, the bill stated that "[a] community facilities district may be established . . . to *provide* [certain enumerated] facilities." (Italics added.) "Since the deletion of language [regarding 'eminent domain'] was the deletion of the *entire bill*, in favor of completely new textual material, we derive no indication of intent as respects a single phrase in the deleted bill." (*Salem v. Superior Court* (1989) 211 Cal.App.3d 595, 601, fn. 2.)

Subsequently, the bill was amended with the current statutory language: "A community facilities district may be established . . . to provide *for the purchase, construction, expansion, or rehabilitation* of any real or other tangible property with an estimated useful life of five years or longer . . . ." (Italics added.) The word "provide" was expanded upon to illustrate its broad sweep rather than to limit its scope.

Golden State asserts that the Legislature never could have intended the Mello-Roos Act to be used to finance something as speculative as an eminent domain

11

acquisition. There are two problems with this argument. First, Golden State cites no authority for the proposition that Mello-Roos financing is available only for investments with certain outcomes. Assessment districts, which function similarly to community facilities districts, can acquire property through eminent domain notwithstanding the risks. (Sts. & Hy. Code, § 5023.1, subd. (c).) Second, acquisition by eminent domain is no more risky than acquisition by a negotiated purchase. Just as a court may determine the property's valuation to be in excess of the available funds, a voluntary seller might make a similarly excessive demand, particularly in the presence of other market participants offering competing bids. In either case, the special agency would have to seek authorization from the voters for additional funds. (§ 53338, subd. (b).) And the possibility that the voluntary seller will pull out of the negotiations or sell to a third party is just as real as the possibility that a court will rule a local agency lacks the power to condemn. In either case, money will have been spent fruitlessly.

It is undisputed that Casitas has the power of eminent domain.[4] For the reasons discussed, we hold that its condemnation of property pursuant to that power qualifies for Mello-Roos financing as a "purchase" of facilities.

### *Mello-Roos Financing for Incidental Acquisitions of Intangible Property*

Golden State contends that the Mello-Roos Act cannot be used to finance the purchase of intangible property or property rights. In a limited sense, this is accurate. "A community facilities district may . . . finance the purchase . . . of any real or other tangible property with an estimated useful life of five years or longer or . . . planning and design work that is directly related [there]to . . . ." (§ 53313.5.) Thus, a community facilities district may not directly purchase intangible property. Borrowing one of

---

[4] Therefore, Golden State's authority to the effect that any "'fair, reasonable doubt concerning the existence of [a municipal corporation's eminent domain] power is resolved by the courts against the corporation . . . .'" (*Harden v. Superior Court* (1955) 44 Cal.2d 630, 641) is inapposite.

Golden State's examples, a community facilities district cannot be created to purchase pencils because their useful life is not five years or longer.

Mello-Roos funding could be used, however, to purchase a pencil factory. Such an acquisition would almost certainly include the factory's current stock of pencils as well as its existing contractual obligations to buy raw materials for manufacturing additional pencils. The Act permits financing the acquisition of the pencils and the contractual obligations because they are "costs and estimated costs incidental to, or connected with, the accomplishment of the purpose for which the proposed debt is to be incurred."[5] (§ 53345.3; accord, § 53317, subd. (e)(2).) In this way, a local agency using Mello-Roos financing can *indirectly* acquire both tangible property with a useful life of less than five years and intangible property including property rights.

Here, Casitas seeks "to acquire the real, personal, and intangible property and property rights owned or held by [Golden State] in, to, and with respect to the water utility owned and operated by Golden State in [its] Ojai Service Area." We understand this to mean that Casitas plans to use Mello-Roos financing to acquire Golden State's Ojai facilities, i.e., its real and tangible personal property used for providing water service to Ojai. In addition, Casitas plans to acquire any of Golden State's intangible property and property rights connected with the acquisition of these facilities. This comports with the Mello-Roos Act.

Golden State argues that the legal costs associated with an eminent domain proceeding and the eventual compensation it will receive from Casitas for its water rights

---

**5** As examples of "incidental" costs, the Act provides the following non-exhaustive list: "estimated costs of construction or acquisition of buildings, or both; acquisition of land, rights-of-way, water, sewer, or other capacity or connection fees; lease payments for school facilities, satisfaction of contractual obligations relating to expenses or the advancement of funds for expenses existing at the time the bonds are issued pursuant to this chapter; architectural, engineering, inspection, legal, fiscal, and financial consultant fees; bond and other reserve funds; discount fees; interest on any bonds of the district estimated to be due and payable within two years of issuance of the bonds; election costs; and all costs of issuance of the bonds, including, but not limited to, fees for bond counsel, costs of obtaining credit ratings, bond insurance premiums, fees for letters of credit, and other credit enhancement costs, and printing costs." (§ 53345.3.)

and loss of goodwill are beyond the scope of Mello-Roos financing.  To the contrary, the Act expressly provides that legal fees are an incidental cost.  (§ 53345.3.)  Water rights are analogous to "rights-of-way," another intangible property right the acquisition of which the Act expressly permits as an incidental cost.**6**  (*Ibid.*)  Compensation for Golden State's loss of goodwill is closely connected with the acquisition of its facilities for delivering water.  Like legal fees and water rights, it is properly classified as an incidental expense that can be financed under Mello-Roos.

### *Limitations on "Services"*

Golden State contends that "Mello-Roos cannot be used simply to replace one service provider with another, where no additional services are provided."  It relies on section 53313, governing "services" financed under the Mello-Roos Act.  That section provides that "[a] community facilities district tax approved by vote of the landowners of the district may only finance the services authorized [by the Act] to the extent that they are in addition to those provided in the territory of the district before the district was created.  The additional services shall not supplant services already available within that territory when the district was created."  Golden State correctly observes that "water utility service is not one of the services specifically listed in the statute that may be financed by a [community facilities district]."  Therefore, it is unclear how section 53313 applies to the instant case, which involves the acquisition of "facilities" and incidental costs rather than "services."  In any event, Golden State has forfeited this argument by failing to raise it below.  (*Richey v. AutoNation, Inc.* (2015) 60 Cal.4th 909, 919, fn. 2.)

### *Conclusion*

Appellant advocates for a rule that would shift the bargaining power decisively in its favor, allowing it to hold out for a sale price far above the market rate while it continues to extract monopoly rents from the people of Ojai.  This is neither

---

**6** We therefore need not decide whether water rights, which can be "considered an interest in real property" (*State v. Superior Court of Riverside County* (2000) 78 Cal.App.4th 1019, 1025), may be directly acquired using Mello-Roos funds.

14

sound policy nor supportable by the statutory text.  Like the trial court, we will not set the will of the voters aside.[7]

## DISPOSITION

The judgment is affirmed.  Costs to respondents.

<u>CERTIFIED FOR PUBLICATION.</u>

**PERREN, J.**

**We concur:**

**GILBERT, P. J.**

**YEGAN, J.**

---

[7] Because we affirm the judgment on the merits, we do not reach respondents' contention that Golden State's service was untimely.  We have not considered the declaration submitted by Casitas's trial counsel regarding the prior use of Mello-Roos funding to finance eminent domain litigation, which is irrelevant to the legal questions at issue.  Accordingly, any error by the trial court in admitting it was harmless.

15

Kent M. Kellegrew, Judge

Superior Court County of Ventura

_____


Manatt, Phelps & Phillips, Michael M. Berger, George M. Soneff, Edward G. Burg, and Benjamin G. Shatz, for Plaintiff and Appellant.

Nossaman, Stephen N. Roberts, Martin A. Mattes, and Mari R. Lane for Park Water Company and California Water Association as Amicus Curiae on behalf of Plaintiff and Appellant.

Rutan & Tucker and Jeffrey M. Oderman for Defendants and Respondents Casitas Municipal Water District and Casitas Municipal Water District Community Facilities District No. 2013-1 (Ojai).

Best Best & Krieger, Kendall MacVey, and Kira L. Klatchko for Association of California Water Agencies, League of California Cities, California State Association of Counties, and California Special Districts Association as Amicus Curiae on behalf of Defendants and Respondents.

Ryan Blatz Law and Ryan Blatz; Law Offices of Ball and Yorke and Esther R. Sorkin for Defendants and Respondents Ojai Friends of Locally Owned Water, Richard H. Hajas, Dale Hanson, Patrick McPherson, Robert R. Daddi, Louis Torres, and Stanley Greene.