[No. A129401. First Dist., Div. Four. Sept. 22, 2011.]

TOMRA PACIFIC, INC., et al., Plaintiffs and Appellants, v.
JOHN CHIANG, as State Controller, etc., et al., Defendants and
Respondents.

COUNSEL

Nielsen, Merksamer, Parrinello, Mueller & Naylor, Richard D. Martland, James R. Parrinello, Christopher E. Skinnell and Kurt R. Oneto for Plaintiffs and Appellants California Chamber of Commerce and Larry Dicke.

Howard Rice Nemerovski Canady Falk & Rabkin, Steven L. Mayer; Garigliano Law Offices and Walter Garigliano for Plaintiffs and Appellants Tomra Pacific, Inc., Jolly Giant Flea Market, Big Foot Recycling, Michael Ray Regan, Daniel Patrick Regan and RB Enterprises Recycling.

Kamala D. Harris, Attorney General, Douglas Woods, Acting Assistant Attorney General, Constance L. LeLouis and Daniel J. Powell, Deputy Attorneys General, for Defendants and Respondents.

OPINION

**SEPULVEDA, J.**—At issue is the legality of $519 million in loans between state funds to help balance the state budget during times of fiscal crisis. We conclude that the loans are lawful. The loan provisions, contained in annual budget bills, are germane to the subject of appropriations and thus do not

violate the single-subject rule prohibiting legislation having multiple subjects. (Cal. Const., art. IV, § 9.) Nor do the loans interfere with the lending fund's regulatory purpose or object. (Gov. Code, § 16310, subd. (a).) We affirm the trial court order denying petitions for a writ of mandate seeking compelled repayment of the loans.

## I. BACKGROUND

The loan transactions are complex and require an understanding of state finances generally, and the specific operation and purpose of the state fund that lent money to other funds.

### A. *State finances*

State government programs are financed, in large part, by expenditures from the General Fund and special funds. (Cal. Dept. of Finance, Finance Glossary of Accounting and Budgeting Terms <http://www.dof.ca.gov/fisa/bag/DofGlossFrm.HTM> [as of Sept. 22, 2011] (hereafter, Finance Glossary).) "The General Fund consists of money received into the treasury and not required by law to be credited to any other fund." (Gov. Code, § 16300.) The primary sources of revenue for the General Fund are personal income taxes, sales taxes, and corporation taxes. (Finance Glossary.) The major uses of the General Fund are education, health and human service programs, and correctional programs. (Finance Glossary.) Special funds are created by statute or regulation and are "used to budget and account for taxes, licenses, and fees that are restricted by law for particular activities of the government." (Finance Glossary.) There are many special funds with billions of dollars in total expenditures. In fiscal year 2010–2011, for example, budget expenditures from the General Fund totaled roughly $92 billion and budget expenditures from special funds were over $30 billion.[1] (Cal. Dept. of Finance, Historical Data, Budget Expenditures <http://www.dof.ca.gov/budgeting/budget_faqs/documents/CHART-B.pdf> [as of Sept. 22, 2011].)

The General Fund and special funds, although separate, are not impermeable. Transfers and loans are statutorily permitted from special funds to the General Fund, and from the General Fund to special funds. (Gov. Code, §§ 16310, 16351.) The statute relevant here provides: "When the General Fund in the Treasury is or will be exhausted, the Controller shall notify the Governor and the Pooled Money Investment Board. The Governor may order the Controller to direct the transfer of all or any part of the moneys not needed in other funds or accounts to the General Fund from those funds or accounts . . . . All moneys so transferred shall be returned to the funds or

---

[1] California's fiscal year runs from June to June.

accounts from which they were transferred as soon as there are sufficient moneys in the General Fund to return them. . . . This section does not authorize any transfer that will interfere with the object for which a special fund was created . . . ." (Gov. Code, § 16310, subd. (a).) The statute includes provision for payment of interest under certain circumstances. (Gov. Code, § 16310, subd. (b).)

Like the Governor's power to order a transfer between funds, the Legislature may enact an appropriations bill that transfers "a special fund reserve temporarily from one purpose to another" provided the transfer does not interfere "with the objects for which such fund was created." (*Daugherty v. Riley* (1934) 1 Cal.2d 298, 309 [34 P.2d 1005].) This district Court of Appeal has recently confirmed that "money in special funds [may] be loaned to shore up the General Fund" subject to the specified statutory conditions of Government Code section 16310: "exhaustion of the General Fund, no interference with the object for which the special fund was created, [and] return of the money as soon as feasible." (*California Medical Assn. v. Brown* (2011) 193 Cal.App.4th 1449, 1458 [123 Cal.Rptr.3d 647] (*California Medical Assn.*).)

In *California Medical Assn.*, the Legislature acted to close a budget deficit by including an item in the 2008 budget bill providing for a loan of $6 million to the General Fund from a special fund, the Contingent Fund of the Medical Board of California. (*California Medical Assn., supra*, 193 Cal.App.4th at p. 1452.) That special fund receives physician licensing fees and uses the money to oversee and discipline physicians. (*Id.* at p. 1453.) The California Medical Association, representing physicians, challenged the legality of the loan with a petition for a writ of mandate directing that the money be returned. (*Id.* at pp. 1452–1453.) Denial of the petition was affirmed on appeal. (*Id.* at p. 1452.) The court held that the loan was authorized under Government Code section 16310, and that the statutory conditions were satisfied. (*California Medical Assn.*, at pp. 1455–1465.) The court found no interference with the object for which the special fund was created, the regulation of California physicians, which continued despite reduced funding. (*Id.* at pp. 1459, 1464–1465.)

The Legislature has made other loans from special funds to the General Fund. At issue here are several loans from a special fund called the California Beverage Container Recycling Fund (Recycling Fund). To understand the parties' claims on appeal, a detailed explanation of the operation and financing of California's recycling program is necessary.

B. *The recycling program*

"In 1986, the Legislature adopted the California Beverage Container Recycling and Litter Reduction Act (Pub. Resources Code, § 14500 et seq.) . . . to encourage large-scale recycling of used beverage containers through a program of financial incentives." (*Californians Against Waste v. Department of Conservation* (2002) 104 Cal.App.4th 317, 319 [127 Cal.Rptr.2d 905].) The California Beverage Container Recycling and Litter Reduction Act (Recycling Act; Pub. Resources Code, § 14500 et seq.) was initially administered by the Department of Conservation, and is now administered by the Division of Recycling in the Department of Resources Recycling and Recovery (CalRecycle).[2] (Pub. Resources Code, §§ 14510.5, 14530.)

The central component of the Recycling Act's complicated system of financial incentives is a refundable deposit on beverage containers paid when beverages are purchased and recovered when empty containers are recycled. Beverage distributors make a " '[r]edemption payment' " to CalRecycle on every beverage container sold or offered for sale in California.[3] (Pub. Resources Code, §§ 14523, 14560.) Redemption payments are deposited in the Recycling Fund. (Pub. Resources Code, § 14580, subd. (a).) The cost of the redemption payment is passed on to the retailer, then the consumer who purchases a beverage. Consumers may return their empty beverage containers to a recycler, who pays a " '[r]efund value.' " (Pub. Resources Code, § 14524.)

The record reflects that, "[o]ver the history of the [Recycling Act], the redemption [payment] and the refund value have usually been equal, although this is not always the case." The record also shows that the redemption payment and refund value have ranged from an initial 1 cent per beverage container to a current high of 5 cents for a container of less than 24-ounce capacity, and 10 cents for a container of 24-ounce or greater capacity. (See Pub. Resources Code, § 14560, subd. (a)(3).)

Not all beverage containers are returned for recycling. The redemption rate for beverage containers is not, and never has been, 100 percent. As a result, a portion of the redemption payments borne by consumers remains in the Recycling Fund and is used to pay CalRecycle operating costs and various fees and grants for curbside collection programs, recycling centers, material processors, and other participants in the recycling stream.

---

[2] For simplicity, the administration of the act at various times is attributed to the current administrator, CalRecycle.

[3] A distributor does not tender the full redemption payment amount to CalRecycle; it pays the redemption payment "less 1.5 percent for the distributor's administrative costs." (Pub. Resources Code, § 14574, subd. (a)(1).)

The Recycling Act strives to establish convenient return systems to encourage recycling by consumers, including curbside programs and recycling centers. (Pub. Resources Code, § 14501, subd. (a).) Curbside programs accept empty beverage containers from consumers for recycling and retain the refund value to offset the cost of their operations, rather than paying the refund value to consumers. (Pub. Resources Code, § 14509.5, subd. (c).) Curbside recycling accounts for about 17 percent of beverage container recycling in California. Most recycling occurs through recycling centers, which pay consumers the refund value of the containers. (Pub. Resources Code, § 14572, subd. (a).) There are two types of recycling centers: traditional recycling centers and convenience zone recycling centers. Both types must be certified by CalRecycle. (Pub. Resources Code, § 14538, subd. (a).)

Traditional recycling centers are relatively large facilities, usually located in sparsely populated areas, to which consumers bring recyclable bottles and cans and exchange them for a refund—by weight or per container. (Pub. Resources Code, § 14572, subd. (a).) Traditional recycling centers redeem the bulk of beverage containers recycled in California, about 62 percent.

Convenience zone recycling centers are smaller operations, typically located in supermarket parking lots and consisting of several large bins and one employee with a scale. (Pub. Resources Code, §§ 14509.4, 14520, 14526.5, 14526.6.) Convenience zone recycling centers provide consumers with a place to redeem beverage containers contemporaneously with grocery shopping, avoiding the need to travel to a traditional recycling center. Consumers generally do not redeem beverage containers at the retail store where they purchased the beverages. Retailers are required to accept returned containers only if there is no convenience zone recycling center in the area. (Pub. Resources Code, § 14571.6.) There are about 2,000 convenience zone recycling centers in California. CalRecycle reports that convenience zone recycling centers handle about 25 percent of the used beverage containers recycled in the state.

Recyclers (curbside programs and recycling centers) sell the used beverage containers to material processors for the containers' scrap value. (Pub. Resources Code, § 14519.5.) The processors sort the containers and sell the reclaimed materials to manufacturers. (Pub. Resources Code, §§ 14518, 14519.) In addition to paying scrap value to the container recyclers, processors (as intermediaries of CalRecycle) also pay the containers' refund value—which reimburses recycling centers for payments made to consumers and

compensates curbside programs for their service.[4] (Pub. Resources Code, § 14573.5, subd. (a)(1).)

From the standpoint of a recycler, it costs more to handle glass and plastic containers for recycling than the materials are worth when sold for scrap to a processor. Among the materials used in beverage containers, aluminum alone has a scrap value in excess of its handling costs. In order to promote the recycling of glass and plastic, the cost of recycling these materials is subsidized with "processing payments." By law, processing payments are the difference between the scrap value of the container and the sum of its average cost to recycle and a "reasonable financial return." (Pub. Resources Code, § 14575, subd. (b)(2).) In early 2009, for example, the processing payment for glass containers was $99.97 per ton—the difference between the per ton scrap value of glass ($5.99) and the sum of the cost of recycling a ton of glass containers with a reasonable financial return for the operation ($105.96). CalRecycle adjusts processing payment amounts periodically based on fluctuating recycling costs and commodity prices. (Pub. Resources Code, § 14575, subd. (c)(1) & (2)(A)–(B).) Both recyclers and processors receive processing payments from CalRecycle.[5] (Pub. Resources Code, §§ 14518.5, 14573, subd. (a)(3), 14573.5, subd. (a)(3).)

Processing payments are funded primarily from the unredeemed deposits paid by consumers who purchase beverages in containers that are not all returned for recycling. Beverage manufacturers that package their products in plastic and glass also pay "processing fees" into the Recycling Fund, which partially funds the processing payments to recyclers. A processing fee is imposed upon manufacturers who use container materials with recycle costs that exceed their scrap value under "the 'polluter-pays' principle," which encourages manufacturers to switch to materials that have a lower cost of recycling and increases the market for recycled products (thus increasing the scrap value of the material over time). Originally, manufacturers paid the entire amount of the processing payment. A manufacturer's contribution is now statutorily capped at 65 percent of the cost of the processing payment. (Pub. Resources Code, § 14575, subd. (e)(1)(A)–(I) & (2).)

CalRecycle may reduce the manufacturer processing fee, subject to the availability of funds, to encourage the use of containers with better recycling

---

[4] Curbside programs also receive a supplemental payment from CalRecycle based on the volume of beverage containers collected in a given year, subject to funding availability. (Pub. Resources Code, § 14549.6.)

[5] Recyclers and processors also receive administrative payments, calculated as a percentage of the containers' refund value. (Pub. Resources Code, §§ 14573, subd. (a)(2), 14573.5, subd. (a)(2).)

rates. (Pub. Resources Code, § 14575, subd. (e)(1)(A)–(I) & (2).) For example, the manufacturer processing fee may be set at only 10 percent of the processing payment for a container type with a recycling rate equal to, or greater than, 75 percent, but the fee may be set at 65 percent of the processing payment for a container type with a recycling rate of less than 30 percent. (Pub. Resources Code, § 14575, subd. (e)(1)(A) & (I).) The vast majority of beverage containers are made of aluminum, glass, and two types of plastic, all of which had a recycling rate in excess of 70 percent in 2009. Manufacturers have therefore paid far less than 65 percent of the processing payment in recent years, when funds were available. Manufacturers have often paid around 20 percent of the processing payment, with the remainder covered by CalRecycle's "processing fee offset" funded by the surplus of redemption payments over redemption refunds.

Convenience zone recyclers located near supermarkets receive an additional financial incentive, beyond the containers' scrap value, processing payments, and administrative payments. They receive "handling fees." (Pub. Resources Code, §§ 14526.6, 14585.) Handling fees are per container fees paid by CalRecycle to convenience zone recyclers as a subsidy, to cover the additional cost of operating recycling collection sites at supermarket locations. (Pub. Resources Code, §§ 14513.4, 14585, subd. (f).) Handling fees are meant to encourage establishment of convenient recycling locations.

In summary, funding for the Recycling Act's beverage container recycling program flows through the Recycling Fund, which CalRecycle administers. Beverage manufacturers pay processing fees to the Recycling Fund on beverage containers that have a recycling cost greater than their scrap value, and distributors make redemption payments to the Recycling Fund on beverage containers, the cost of which is ultimately passed through to consumers. In turn, the Recycling Fund makes several types of payments to consumers, recyclers, and processors to encourage recycling.

The program has been a great success. In 2008, Californians recycled over 16 billion beverage containers and California leads the nation in total quantity of bottles and cans recycled. The Recycling Act established a beverage container recycling goal of 80 percent. (Pub. Resources Code, § 14501, subd. (c).) The recycling rate was 52 percent in 1988, shortly after the program began. The recycling rate reached 82 percent in 2009, despite program alterations over the years that added new container types with historically low recycling rates. Since inception of the recycling program in 1987, more than 200 billion beverage containers have been recycled.

C. *The Recycling Fund and loans to the General Fund and Air Pollution Control Fund*

The Recycling Fund was designed to be self-financing with the redemption payments funding consumer refunds, processing payments, and other costs. The Recycling Fund maintained an equilibrium in its first years but expenditures exceeded revenue in the early 1990's when the refund value was set higher than the redemption payment on beverage containers. The Recycling Fund borrowed about $43 million to maintain its solvency during the early 1990's. In 1992, the redemption payment and refund value were reconciled to the same amount so the program was not paying out more money than it was receiving on each beverage container. For many years thereafter, the Recycling Fund enjoyed a surplus balance because the recycling program generated revenue in excess of expenditures. As noted earlier, the Recycling Act established a beverage container recycling goal of 80 percent. (Pub. Resources Code, § 14501, subd. (c).) Recycling rates were often lower than 80 percent, especially after the program was expanded in 1999 to include additional types of containers. The excess of redemption payments over refund claims created a fund surplus. At the end of fiscal year 2001–2002, the Recycling Fund balance was over $155 million and growing.

In 2002, an economic downturn and stock market drop led to a budget shortfall in California's General Fund. (Legis. Analyst, Cal. Spending Plan 2002–03, ch. 1 <http://www.lao.ca.gov/2002/spend_plan_02/0902_spend_plan_chap_1.html> [as of Sept. 22, 2011].)[6] The shortfall was addressed, in part, by interfund loans. (Legis. Analyst, Cal. Spending Plan 2002–03, ch. 3.) The Legislature approved $2.6 billion of loans and transfers from special funds to the General Fund in the 2002 budget bill. (*Ibid.*) Among those was a loan from the Recycling Fund to the General Fund. The 2002 budget bill authorized the Director of Finance to order the Controller to transfer $188 million from the Recycling Fund to the General Fund to be repaid, with interest, by June 30, 2009.[7] The bill stated: "It is the intent of the Legislature that the repayment is made so as to ensure that the programs supported by this fund are not adversely affected by the loan." A loan of $98.3 million from the Recycling Fund to the General Fund was made in 2003 on similar terms, and an additional $66 million was borrowed from Recycling Fund subaccounts that year.

The Recycling Fund balance remained high despite these loans. At the end of fiscal year 2003–2004, the Recycling Fund balance was over $83 million

---

[6] The parties included in the record various reports from the Legislative Analyst's Office. We have also taken judicial notice of additional reports. (Evid. Code, § 452, subd. (c).)

[7] The budget bill actually approved a larger amount for transfer but the Recycling Fund could not accommodate a loan greater than $188 million.

and grew to $214 million or more by the end of fiscal year 2005–2006.[8] In a 2006 report, the Legislative Analyst's Office concluded that the Recycling Fund "essentially 'clears' itself" when the recycling rate reaches around 80 percent, given the recycling program's then current level of spending. (Legis. Analyst, Analysis of the 2006–07 Budget Bill: Dept. of Conservation (3480) <http://www.lao.ca.gov/analysis_2006/resources_05_3480_an106.html> [as of Sept. 22, 2011].) In other words, if consumers recycled 80 percent of purchased beverage containers, all redemption payments on the containers would be paid out in redemption refunds, processing fee offsets, handling fees, administrative fees, operational costs, and other program costs (such as grants and public education). (*Ibid.*) The recycling rate had been 61 percent or less from 2000 to 2005. As a result, a significant amount of money accumulated in the Recycling Fund. (*Ibid.*) The Legislative Analyst's Office noted that the Legislature may "want to consider extending the repayment period for the monies loaned to the General Fund from the [Recycling Fund] in 2002-03 and 2003-04" given the state's fiscal condition and the large balance in the Recycling Fund. (*Ibid.*) But it also noted that a loan extension would "not assist the program in meeting its recycling target" and suggested directing CalRecycle to evaluate options, such as increased expenditures, to raise the recycling rate toward the statutory goal and lower the fund balance "to more reasonable levels." (*Ibid.*)

The Legislature adopted a number of measures relating to the recycling program in 2006. (Stats. 2006, ch. 907.) The Legislature extended time for repayment of the 2002 and 2003 loans from the Recycling Fund to the General Fund until June 30, 2013, and also amended various provisions of the Recycling Act to increase CalRecycle expenditures. (Stats. 2006, ch. 907.) Among other things, the Legislature increased processing payments, handling fees, incentive payments, and grants. The Legislature also directed CalRecycle to submit a report addressing the Legislative Analyst Office's concerns with the below-target recycling rate and high fund balance. CalRecycle submitted a report in February 2007. CalRecycle estimated that revenues and expenditures would be nearly balanced in the short term at around $1 billion each but that program changes would increase expenditures and the recycling rate over time, leading to a reduced Recycling Fund balance.

The Recycling Fund continued to have a positive fund balance at the end of fiscal year 2007–2008. The fund balance at that time was over $306 million, and an additional loan from the Recycling Fund was made. The September 2008 budget bill authorized a $32 million loan from the Recycling Fund to the Air Pollution Control Fund (a fund administered by the State Air Resources Board) to assist in the implementation of programs to reduce

---

[8] A 2007 CalRecycle report listed the ending fund balance for fiscal year 2005–2006 at $214 million. A 2010 auditor's report put the figure higher.

greenhouse gas emissions, with full repayment due by June 30, 2013. The Recycling Fund's balance was $160 million at the end of fiscal year 2008–2009, after making the loan to the Air Pollution Control Fund.

In November 2008, CalRecycle prepared forecast figures for the 2009–2010 budget being prepared by the Governor. CalRecycle projected a surplus fund balance of $81 million for fiscal year 2009–2010. The February 2009 budget bill approved a loan of $99.4 million from the Recycling Fund to the General Fund, with repayment "made so as to ensure that the programs supported by the [Recycling Fund] are not adversely affected by the loan, but no later than June 30, 2013." The interfund transfer was directed to be made by the Controller, upon order of the Director of Finance. The budget bill also authorized an immediate $35 million loan from the Recycling Fund to the Air Pollution Control Fund, to be "repaid by the earliest feasible date" but no later than June 30, 2014.

D. *CalRecycle projects a fund deficit in May 2009*

CalRecycle's projection of a fund surplus for fiscal year 2009–2010 was wrong. A later audit revealed that CalRecycle's forecast model was flawed, which led the department to understate expenditures and thus overstate its projected fund balance. CalRecycle stated that market changes also led to an overstatement of the projected fund balance, including reduced sales of beverages resulting in lower revenue and higher recycling rates that increased expenditures.

The recycling rate rose from 61 percent in 2005 to 82 percent in 2009, surpassing the Recycling Act's goal of an 80 percent recycling rate. (Pub. Resources Code, § 14501, subd. (c).) At these recycling rates, expenditures outpaced revenue and the Recycling Fund experienced an operating deficit. An audit report shows that in fiscal year 2008–2009, CalRecycle collected about $1.2 billion in redemption payments and paid almost all of that amount—about $1 billion—in refund claims. The additional program expenses were over $300 million, thus exceeding the remaining $200 million collected as redemption payments.

In April 2009, CalRecycle informed the Department of Finance, through a series of informal meetings, that a correction of CalRecycle's earlier forecast of its fund condition was needed. CalRecycle also reportedly notified the Department of Finance that the $99.4 million loan to the General Fund authorized by the 2009 budget bill would add to the Recycling Fund's projected deficit. However, CalRecycle had not yet fully analyzed the nature of the error in its earlier projection and thus did not explain the specific factors causing the need for revision. The loan proceeded as planned.

In May 2009, CalRecycle advised the Legislature that CalRecycle was forecasting a $154.1 million deficit in the Recycling Fund for fiscal year 2009–2010. The projected fund deficit triggered statutory provisions requiring CalRecycle to implement funding cuts.

E. *Reduced processing payments, processing fee offsets, and handling fees beginning July 2009*

 The Recycling Act specifies that processing payments to recyclers and processors, processing fee offsets to manufacturers, and handling fees to convenience zone recycling centers are "subject to the availability of funds." (Pub. Resources Code, § 14575, subd. (e)(1); see *id.*, § 14581, subds. (a), (c).) At the time relevant here, the Recycling Act required CalRecycle to "review all funds on a quarterly basis to ensure that there are adequate funds" to make processing payments, pay handling fees, and support a variety of other recycling programs. (Pub. Resources Code, former § 14581, subd. (c)(1).) If CalRecycle's review determines that there "may be inadequate funds," CalRecycle "shall immediately notify the appropriate policy and fiscal committees of the Legislature" and, "[o]n or before 180 days after the notice is sent," "may reduce or eliminate expenditures" as necessary. (*Id.*, subd. (c)(2), (3).) If reduction is ordered, CalRecycle "shall reduce all payments proportionally." (*Id.*, subd. (d).)

CalRecycle notified the Legislature of the projected deficit in May 2009 and, in June 2009, announced payment reductions to recycling program participants. In its June 23, 2009 announcement, CalRecycle reported that "[t]he dramatic increase in the recycling rate, coupled with a flattening of container sales due to the downturn in the economy, has resulted in increased payouts without a commensurate rise in previously expected revenues." Having "determined that there will be inadequate monies in the [Recycling Fund] to make all of the payments" specified in the Recycling Act, CalRecycle announced a proportional reduction in processing payments, processing fee offsets, handling fees, curbside supplemental payments, and a host of other programs, effective July 1, 2009. Further reductions were announced effective November 1, 2009. Overall, payments to recyclers were reduced by about 15 percent, and beverage manufacturer processing fee costs were increased by around $50 million. Redemption refunds and administrative fees were unaffected by the projected fund deficit and continued to be paid in full.

F. *Executive and legislative efforts to address the Recycling Fund deficit*

Upon learning of the projected deficit in the Recycling Fund in May 2009, the Governor proposed restructuring the program to address its fiscal problems. The Legislature rejected the proposal and enacted its own in September

2009 but the Governor vetoed it. A resolution was reached in March 2010. The Legislature passed—and the Governor signed—emergency legislation that returned the Recycling Fund to solvency. (Stats. 2009, 8th Ex. Sess. 2009–2010, ch. 5.) The legislation suspended some program expenditures that were otherwise required for public education and grants, accelerated redemption payments due from distributors, and reduced some incentive payments and subsidies. These changes saved millions of dollars. The Recycling Fund also received $28.9 million in repayment of its prior loans to the General Fund and a loan of $8.25 million from a special fund. (CalRecycle, Quarterly Report on Status of the Beverage Container Recycling Fund (Apr. 8, 2011) (CalRecycle April 2011 Status Report) <http://www.calrecycle.ca.gov/BevContainer/RecycleFund/2011/AprStatus.pdf> [as of Sept. 22, 2011].) The Legislature also amended the Recycling Act in March 2009 to declare "that the maintenance of the fund is of the utmost importance to the state and that it is essential that any money in the fund be used solely for the purposes authorized in this division and should not be used, loaned, or transferred for any other purpose." (Pub. Resources Code, § 14580, subd. (e).)

G. *Restoration of payments to program participants and continued loan repayment*

In March 2010, with solvency reestablished, CalRecycle announced to program participants that processing payments, processing fee offsets, and handling fees would be restored, retroactive to January 2010. The reduced payments lasted six months, from July 2009 through December 2009. CalRecycle ended fiscal year 2009–2010 with a fund balance of $119 million. (CalRecycle April 2011 Status Report.) Despite the reduced financial incentives occasioned by CalRecycle's temporary insolvency in 2009, the recycling rate was at an above-target rate of 82 percent from 2009 through 2010. (CalRecycle, State's Beverage Container Recycling Rate Matches All-Time High in 2010 <http://www.calrecycle.ca.gov/NewsRoom/2011/05May/06.htm> [as of Sept. 22, 2011].)

The Recycling Fund has continued to receive loan repayments. In fiscal year 2010–2011, the General Fund made loan repayments of $98 million to the Recycling Fund. (CalRecycle, Quarterly Report on Status of the Beverage Container Recycling Fund (July 11, 2011) (CalRecycle July 2011 Status Report) <http://www.calrecycle.ca.gov/BevContainer/RecycleFund/2011/JulStatus.pdf> [as of Sept. 22, 2011].) The Air Pollution Control Fund repaid $21 million to the Recycling Fund that same year. (*Ibid.*) The Governor's budget for fiscal year 2011–2012 provides for additional loan repayments of $88 million from the General Fund and $21 million from the Air Pollution Control Fund. (*Ibid.*) In total, the Legislature authorized $519 million in loans from the Recycling Fund to another special fund and the General Fund

between 2002 and 2009. Approximately $148 million has been repaid as of July 2011, and further repayment is expected. (CalRecycle July 2011 Status Report; CalRecycle April 2011 Status Report.)

In the July 2011 report, CalRecycle forecast that the Recycling Fund "will be solvent as long as expected loan repayments to the Recycling Fund continue." (CalRecycle July 2011 Status Report.) CalRecycle projects a positive fund balance through the end of fiscal year 2011–2012, even without loan repayment from the General Fund, but the necessary fund reserve will require sizeable loan repayments. (*Ibid.*) CalRecycle reports that the Recycling Fund's solvency is "based upon loan repayments" because expenditures are expected to be greater than revenue in fiscal year 2011–2012. (*Ibid.*) This assumes, of course, no additional structural reforms of the recycling program that change the level of revenue and expenditures. A number of options, however, are being considered and may affect the Recycling Fund balance in the future. (Legis. Analyst, The 2010–11 Budget: Funding and Policy Options for the Beverage Container Recycling Program (Mar. 18, 2010).)

## II. TRIAL COURT PROCEEDINGS

This litigation began in late 2009, after CalRecycle reduced processing payments to beverage container recyclers and processors and reduced handling fees to convenience zone recycling centers. In November 2009, three recycling center operators filed a petition for a writ of mandate and a complaint for declaratory relief in the Alameda County Superior Court. Plaintiffs are Tomra Pacific, Inc., Jolly Giant Flea Market, Inc., and Michael Ray Regan and Daniel Patrick Regan, doing business as R.B. Enterprises Recycling (collectively, Recycling Center Plaintiffs). They sued the Controller, the Director of Finance, and the Director of CalRecycle. The Recycling Center Plaintiffs allege that the "improper and ill-advised" loans from the Recycling Fund to the General Fund rendered the Recycling Fund insolvent and unable to make full payments to them and other recyclers, with "disastrous consequences" to the recyclers and the recycling program as a whole. (Boldface and capitalization omitted.) The Recycling Center Plaintiffs seek a declaration that the failure to repay the loans violates state law and a writ of mandate compelling the defendant state officials to reimburse the Recycling Fund for transfers made to the General Fund, and to restore full handling fees and processing payments to participants in the recycling program.

In December 2009, the California Chamber of Commerce and taxpayer Larry Dicke (collectively, Chamber of Commerce Plaintiffs) brought related claims against the same state officials named by the Recycling Center Plaintiffs. The Chamber of Commerce Plaintiffs seek a declaration that the loans from the Recycling Fund to another special fund and the General Fund

are illegal and a writ of mandate compelling the defendant state officials to transfer back all funds borrowed from the Recycling Fund and to recalculate manufacturer processing fees based on the increased fund balance.

The two cases were consolidated in the trial court and heard on March 19, 2010. The Recycling Center Plaintiffs argued that the loans from the Recycling Fund depleted its balance and forced "drastic cuts" in payments to recycling centers that threatened the existence of those centers and, in turn, California's recycling program. The Recycling Center Plaintiffs claimed that the loans violated Government Code section 16310, subdivision (a), which prohibits "any transfer that will interfere with the object for which a special fund was created" and violated the budget bills which, consistent with the principle reflected in Government Code section 16310, authorized loans to the General Fund with the stated intent that repayment would be "made so as to ensure that the programs supported by [the Recycling Fund] are not adversely affected by the loan[s]."

The Chamber of Commerce Plaintiffs raised additional legal objections to the loans. They argued that inclusion of the loan provisions in the budget bills violated the state constitutional provision that "[a] statute shall embrace but one subject . . . ." (Cal. Const., art. IV, § 9.) In a related argument, the Chamber of Commerce Plaintiffs argue that transferring money from the Recycling Fund to the General Fund "essentially changes the nature of the manufacturer processing fee [paid to the Recycling Fund] from a regulatory fee used to fund the cost of the beverage container recycling program into a general tax" and, as a general tax, was improperly included in the budget bills.

The court denied the writ petitions and entered an order in favor of defendants. The court found that the program reductions did not interfere with, or adversely affect, the Recycling Fund's objective and that CalRecycle may not be compelled to restore prior funding levels given its statutorily conferred discretion to impose reductions. (Gov. Code, § 16310, subd. (a); Pub. Resources Code, § 14581, former subd. (c)(3).) The court also found that the loan provisions in the budget bills were concerned with appropriations and were thus compliant with the single-subject rule. (Cal. Const., art. IV, § 9.) The court rejected the claim that manufacturer processing fees were taxes. Manufacturers never pay more than a portion of the cost of recycling the manufacturer's beverage containers, with the rest subsidized by the state. (Pub. Resources Code, § 14575, subd. (e)(1).) The increase in processing payments was thus no more than a decrease in a subsidy, not a tax, the court reasoned.

The Recycling Center Plaintiffs and Chamber of Commerce Plaintiffs filed notices of appeal from the court's order. We note that the order denying the

petitions for a writ of mandate is not termed a judgment and does not explicitly address the declaratory relief causes of action. Nevertheless, we are satisfied that the order before us constitutes an appealable final judgment as it left no issue for further consideration. (Code Civ. Proc., § 904.1, subd. (a)(1); *Bettencourt v. City and County of San Francisco* (2007) 146 Cal.App.4th 1090, 1097–1098 [53 Cal.Rptr.3d 402].)

## III. DISCUSSION

A. *Budget act loans from one state fund to others did not violate the single-subject rule*

█ The California Constitution provides: "A statute shall embrace but one subject, which shall be expressed in its title. If a statute embraces a subject not expressed in its title, only the part not expressed is void." (Cal. Const., art. IV, § 9.) Budget bills appropriate funds for expenditure and are authorized to contain more than one item of appropriation. (Cal. Const., art. IV, § 12.) In 2002, the Legislature enacted legislation "making appropriations for the support of the government of the State of California and for several public purposes" entitled "Budget Act of 2002." (Stats. 2002, ch. 379, p. 1472.) The Budget Act of 2002 included numerous items, including $2.6 billion in loans and transfers from special funds to the General Fund. (Legis. Analyst, Cal. Spending Plan 2002–03, ch. 3.) Among these was an item authorizing a loan from the Recycling Fund to the General Fund in an amount ultimately set at $188 million.

█ The Chamber of Commerce Plaintiffs argue that the loan from the Recycling Fund to the General Fund in the Budget Act of 2002, and similar loans in subsequent budget bills, violates the single-subject rule embodied in article IV, section 9 of the California Constitution by containing multiple subjects—the proper subject of appropriations for the support of state government and the separate subject of loans between state funds, which is a subject not expressed in the bills' titles. Plaintiffs are correct in pointing out that "[a] statute must comply with both the requirement that it be confined to one subject and with the command that this one subject be expressed in its title." (*Harbor v. Deukmejian* (1987) 43 Cal.3d 1078, 1096 [240 Cal.Rptr. 569, 742 P.2d 1290].) Plaintiffs are incorrect, however, in their assertion that the budget bills at issue here violated these requirements.

1. *The loan provisions are cognate and germane to the subject matter designated by the budget bill title: appropriations*

█ "The single subject clause has as its 'primary and universally recognized purpose' the prevention of log-rolling by the Legislature, i.e., combining several proposals in a single bill so that legislators, by combining their

votes, obtain a majority for a measure which would not have been approved if divided into separate bills. [Citation.] . . . The purpose of the requirement that the single subject of a bill shall be expressed in its title is to prevent misleading or inaccurate titles so that legislators and the public are afforded reasonable notice of the contents of a statute." (*Harbor v. Deukmejian, supra*, 43 Cal.3d at p. 1096.)

■ "[T]he single-subject rule 'is to be liberally construed to uphold proper legislation and not used to invalidate legitimate legislation.' [Citations.] The Legislature may combine in a single act numerous provisions ' "governing projects so related and interdependent as to constitute a single scheme," ' and provisions auxiliary to the scheme's execution may be adopted as part of that single package. [Citation.] The act's title 'need not contain either an index or an abstract of its provisions. The constitutional mandate [citation] is satisfied if the provisions themselves are cognate and germane to the subject matter designated by the title, and if the title intelligently refers the reader to the subject to which the act applies, and suggests the field of legislation which the text includes.' " (*Marathon Entertainment, Inc. v. Blasi* (2008) 42 Cal.4th 974, 988–989 [70 Cal.Rptr.3d 727, 174 P.3d 741].) In short, legislation complies with the single-subject rule "if its provisions are either functionally related to one another or are reasonably germane to one another or the objects of the enactment." (*Harbor v. Deukmejian, supra*, 43 Cal.3d at p. 1100.)

■ The challenged provisions in the budget bills lending money from a special fund to the General Fund are functionally related to expenditures from the General Fund, and are reasonably germane to each other and the objects of the enactments, which are appropriations for the support of state government. Transfers and loans between funds are integral parts of government finance and, indeed, of any organization that handles large sums of money. (See *Service Employees Internat. Union, Local 1000 v. Brown* (2011) 197 Cal.App.4th 252, 268, fn. 8 [128 Cal.Rptr.3d 711] [interfund loans "have become an integral component of the budgetary calculus"].) The movement of money from one fund with a surplus to another with a deficit fosters efficient appropriation and sound financial management.

The Recycling Fund itself has been a recipient of interfund loans, receiving loans from other funds in its early years and more recently when it faced an unexpected deficit. As we noted earlier, the Recycling Fund borrowed about $43 million to maintain its solvency during the early 1990's. In the fiscal year 2009–2010 budget, the Legislature approved an $8.25 million loan from a special fund to the Recycling Fund, which helped return the Recycling Fund to solvency and end the disputed processing payment and fee reductions. (CalRecycle April 2011 Status Report.)

■ Appropriations and interfund loans are not separate subjects but are intricately intertwined. ■ A legislative provision is "germane" for purposes of the single-subject rule if it is "auxiliary to and promotive of the main purpose of the act or has a necessary and natural connection with that purpose . . . ." (*Metropolitan Water Dist. v. Marquardt* (1963) 59 Cal.2d 159, 172–173 [28 Cal.Rptr. 724, 379 P.2d 28].) The loan provisions at issue here both promote the main purpose of the act (appropriations for the support of the government and public functions) and have a natural connection with that purpose.

2. *The loan provisions are not disguised efforts at changing existing statutes or agency authority*

The Chamber of Commerce Plaintiffs argue that the budget bill loans' provisions are "substantive in nature" and meant to divert money from the Recycling Act's statutory purposes related to beverage container recycling to unauthorized uses. Although it is true that budget bills are "particularly susceptible to abuse" of the single-subject rule and have sometimes been used as vehicles for substantive policy changes, we see no evidence of that here. (*Planned Parenthood Affiliates v. Swoap* (1985) 173 Cal.App.3d 1187, 1198 [219 Cal.Rptr. 664] (*Planned Parenthood*).)

Our Supreme Court has observed that the single-subject rule was adopted to cure "an abuse [that] had grown up, which consisted in attaching to a bill dealing with one matter of legislation a clause entirely foreign to that subject-matter, to the end that, hidden under the cloak of the meritorious legislation, the obnoxious measure might 'ride through.' " (*Ex parte Hallawell* (1909) 155 Cal. 112, 114 [99 P. 490].) " 'History tells us that the general appropriation bill presents a special temptation for the attachment of riders. It is a necessary and often popular bill which is certain of passage. If a rider can be attached to it, the rider can be adopted on the merits of the general appropriation bill without having to depend on its own merits for adoption.' " (*Planned Parenthood, supra*, 173 Cal.App.3d at p. 1198.) But this case does not concern unrelated riders attached to a budget bill and, contrary to plaintiffs' claim, bears no resemblance to *Planned Parenthood*.

In *Planned Parenthood*, the Legislature adopted a budget bill provision that effectively amended existing statutes to prohibit the state Office of Family Planning from making state funds available to any clinic that performs, promotes, or advertises abortion. (*Planned Parenthood, supra*, 173 Cal.App.3d at p. 1191.) This Court of Appeal found the provision unconstitutional under the single-subject rule because the provision changed the substantive authority of a state agency, which was a subject materially distinct from the subject of appropriations. (*Id.* at pp. 1201–1202.) A number of cases

have found violations of the single-subject rule where "a substantive policy change 'masquerad[es] as [a] Budget Act provision[].'" (*Professional Engineers in California Government v. Schwarzenegger* (2010) 50 Cal.4th 989, 1049–1050 & fn. 37 [116 Cal.Rptr.3d 480, 239 P.3d 1186] [collecting cases] (*Professional Engineers*).) This is not such a case.

This case is closer to a recent California Supreme Court case that upheld a budget bill provision against a claim that the provision violated the single-subject rule. (*Professional Engineers, supra*, 50 Cal.4th at pp. 1049–1051.) In *Professional Engineers*, the Legislature adopted a provision in the Budget Act of 2008 reducing the appropriations for state employee compensation and authorizing the use of furlough plans as a means of achieving the reduction. (*Professional Engineers*, at pp. 1044, 1049.) The plaintiffs there argued that the furlough plan provision violated the single-subject rule, and our high court rejected the argument. (*Id.* at p. 1049.) The court contrasted the case before it with *Planned Parenthood, supra*, 173 Cal.App.3d 1187 and similar cases, noting that the furlough provision was related to appropriations and "does not substantively amend or change any existing statutory provision or expand or restrict the substantive authority of any state agency." (*Professional Engineers*, at pp. 1049–1050.)

■ The loans from the Recycling Fund to the General Fund are likewise related to appropriations and do not change existing statutes or agency authority. ■ The Chamber of Commerce Plaintiffs claim otherwise and insist that the loan provisions changed two sections of the Public Resources Code: (1) section 14580, subdivision (a)(1), which provides that redemption payments and other revenue shall be deposited in the Recycling Fund and that money in the fund is "continuously appropriated" to CalRecycle for the payment of refund values and processor administrative fees and (2) former section 14581, subdivision (a)(7)(B), which provided that, "[s]ubject to the availability of funds," processing fee revenues are "continuously appropriated" to CalRecycle for processing payments. Plaintiffs argue that the budget bill loan provisions effectively amend these code provisions by directing Recycling Fund money elsewhere. We disagree.

The budget bill loan provisions authorized loans of Recycling Fund balance surpluses, not diversions of revenue nor a cancellation of appropriations to the recycling program. Redemption payments, processing fees, and other revenue continued to be deposited in the Recycling Fund and appropriated to the payment of refund values, processor administrative fees, and processing payments. Refund values and processor administrative fees under Public Resources Code former section 14580, subdivision (a)(1) were not impacted by the loans. Those payments were always paid in full, even when an unforeseen deficit occurred in the Recycling Fund and temporary reductions in other aspects of the recycling program were imposed. Processing fee

revenue from manufacturers under Public Resources Code section 14581, subdivision (a)(7)(B) also continued to be appropriated to processing payments. Manufacturers paid more in processing fees when the Recycling Fund experienced a deficit in 2009 and their subsidy was reduced, but all manufacturer processing fees remained appropriated to processing payments.

Even if there were some impact on processing fee appropriations under Public Resources Code section 14581, subdivision (a)(7)(B), any impact was an unforeseen consequence of borrowing money from the fund. Lending money from one fund to another was germane to appropriations and was not a purposeful change to the statute or agency authority extraneous to appropriations. The Legislature did not direct money away from the Recycling Fund with the intention or effect of reducing CalRecycle appropriations or rendering CalRecycle unable to function. At the time each budget bill was enacted, the Recycling Fund had a balance surplus. The fund's deficit in fiscal year 2009–2010 was the unexpected result of market changes that increased expenditures and reduced revenues, and flaws in CalRecycle's projections that overstated the fund's balance. It is argued that the budget bill loans were excessive given later developments. The point is debatable but the debate is irrelevant to our consideration of the single-subject rule. The single-subject rule does not demand legislative foresight, only legislative focus. The loan provisions were properly focused on the single subject of appropriations and were not disguised efforts at changing existing statutes or agency authority "hidden under the cloak" of lawful appropriations. (*Ex parte Hallawell, supra,* 155 Cal. at p. 114.) The loan provisions concerned only the one subject of appropriations to support the annual budget, not more than one subject, and therefore do not violate the single-subject rule.

### 3. *The budget bill loans did not convert regulatory processing fees into taxes*

The Chamber of Commerce Plaintiffs allege that the budget bills are not properly focused upon the single subject of appropriations because the bills' loan provisions effectively impose a tax upon beverage manufacturers by diverting fees the manufacturers pay into the Recycling Fund for regulatory functions into funds used for general revenue purposes. A tax, plaintiffs argue, is not an appropriation and therefore offends the constitutional single-subject rule. (Cal. Const., art. IV, § 9.) We reject the argument. Regulatory fees paid into the Recycling Fund were not converted into taxes when the Recycling Fund made loans to the General Fund.

As discussed previously, the Recycling Act imposes processing fees upon beverage manufacturers, which partially fund processing payments made to recyclers and processors to encourage the recycling of glass and

plastic beverage containers that have low scrap value. (Pub. Resources Code, §§ 14518.5, 14573, subd. (a)(3), 14573.5, subd. (a)(3), 14575, subd. (e)(1).) A processing fee is imposed upon manufacturers who use container materials with recycle costs that exceed their scrap value under the "polluter-pays" principle, which encourages manufacturers to switch to materials that have a lower cost of recycling. The manufacturer processing fee is statutorily capped at 65 percent of the cost of the processing payment. (Pub. Resources Code, § 14575, subd. (e)(1)(I).)

The Chamber of Commerce Plaintiffs allege in their complaint that "[t]he processing fees paid by beverage manufacturers are not being used for regulatory purposes but instead to fund general government purposes through the General Fund. As such, the manufacturer's processing fee is a tax." On appeal, these plaintiffs suggest that redemption payments made by consumers are also being converted to taxes but that claim was not alleged in the complaint nor raised in the memorandum supporting the petition for a writ of mandate, and therefore is not a proper subject for this appeal. The relevant question is whether the processing fee is a tax, as plaintiffs allege. We conclude that the processing fee is a regulatory fee, not a tax.

 "In general, taxes are imposed for revenue purposes, rather than in return for a specific benefit conferred or privilege granted." (*Sinclair Paint Co. v. State Bd. of Equalization* (1997) 15 Cal.4th 866, 874 [64 Cal.Rptr.2d 447, 937 P.2d 1350] (*Sinclair Paint*).) Fees are imposed to support regulatory activities or "to defray the actual or anticipated adverse effects of various business operations." (*Id.* at pp. 876–877.) But the word " 'tax' has no fixed meaning, and . . . the distinction between taxes and fees is frequently 'blurred,' taking on different meanings in different contexts." (*Id.* at p. 874.) The California Supreme Court has therefore set out guidelines for determining whether a denominated fee is, in fact, a bona fide regulatory fee and not a disguised tax. (*Id.* at pp. 873–881.) In *Sinclair Paint*, a plaintiff complained that a fee enacted by majority vote of the Legislature was, in effect, a tax, and unconstitutional because taxes require a two-thirds vote of the Legislature. (*Id.* at p. 870; Cal. Const., art. XIII A, § 3.) Plaintiffs here base their constitutional challenge upon the single-subject rule (Cal. Const., art. IV, § 9), but *Sinclair Paint* is instructive in distinguishing fees from taxes.

In *Sinclair Paint*, the court reviewed a statute enacted by the Legislature to address childhood lead poisoning. (*Sinclair Paint, supra*, 15 Cal.4th at p. 870; Health & Saf. Code, § 105275 et seq.) The statute established a program to provide medical evaluation and services for children who were deemed potential victims of lead poisoning. (*Sinclair Paint, supra*, at p. 870.) The program was funded by fees assessed on paint manufacturers and other contributors to environmental lead contamination. (*Ibid.*) A paint manufacturer alleged that the fees were really taxes, and unauthorized because they

were not enacted by a two-thirds majority vote. (Cal. Const., art. XIII A, § 3; *Sinclair Paint, supra,* at p. 870.) The California Supreme Court held that the statute "imposed bona fide regulatory fees, not taxes, because the Legislature imposed the fees to mitigate the actual or anticipated adverse effects of the fee payers' operations." (*Sinclair Paint, supra,* at p. 870.) The court explained that the government may charge fees " ' "in connection with regulatory activities which fees do not exceed the reasonable cost of providing services necessary to the activity for which the fee is charged and which are not levied for unrelated revenue purposes." ' " (*Id.* at p. 876, quoting *Pennell v. City of San Jose* (1986) 42 Cal.3d 365, 375 [228 Cal.Rptr. 726, 721 P.2d 1111].)

The Chamber of Commerce Plaintiffs concede that the processing fee imposed upon beverage manufacturers meets the first criterion of *Sinclair Paint* because the fee is regulatory in nature and is limited to the costs of the service or program. Plaintiffs contend that the processing fee fails the second criterion of *Sinclair Paint,* asserting that the fee is imposed for unrelated revenue purposes. We reject the contention. The fee is levied upon beverage manufacturers as a partial contribution to the processing payment made to recyclers and processors for recycling the manufacturers' containers. The processing fee is a regulatory fee and not a tax because the fee is collected to mitigate the adverse effects of the fee payers' operations and not for unrelated revenue purposes. (*Sinclair Paint, supra,* 15 Cal.4th at pp. 870, 876.)

▉ Chamber of Commerce Plaintiffs do not dispute this statutory framework but argue that processing fees, although initially *collected* for regulatory purposes, were *diverted* to other purposes when the Legislature put Recycling Fund money into the General Fund, where it was used for general revenue purposes unrelated to recycling. The argument would have more force if the diversion plaintiffs decry were a permanent diversion of Recycling Fund money to the General Fund. Plaintiffs often put quotation marks around the word "loan" when describing the fund transfers, implying that the transfers are actually permanent diversions. The record does not support that view. Each of the challenged budget bills expressly provides that the transfer of funds from the Recycling Fund to the General Fund is a loan that will be fully repaid with interest. As of July 2011, roughly $148 million has been repaid, representing over 28 percent of the aggregate loan amount, and further repayment is included in the Governor's budget for the next fiscal year. (CalRecycle July 2011 Status Report; CalRecycle April 2011 Status Report.) The fund transfers are loans, not permanent diversions. We reject plaintiffs' position that a regulatory fee becomes a tax when the regulatory fund lends money to the General Fund. The budget bills did not enact a tax and did not violate the single-subject rule.

B. *The loans from the Recycling Fund did not interfere with the object for which the Recycling Fund was created*

All plaintiffs, both the Chamber of Commerce Plaintiffs and the Recycling Center Plaintiffs, contend that the loans from the Recycling Fund to the General Fund and the Air Pollution Control Fund adversely affected recycling programs and interfered with the object for which the Recycling Fund was created. We find insufficient evidence of interference with the Recycling Fund's regulatory object of promoting beverage container recycling.

1. *Government Code section 16310 establishes the relevant standard for determining the lawfulness of interfund loans*

For over a century, California statutory law has permitted a loan from a special fund to the General Fund provided the loan does not interfere with the object for which the special fund was created. (Gov. Code, § 16310; see *California Medical Assn., supra,* 193 Cal.App.4th at pp. 1456–1457 [discussing former Pol. Code, § 444].) Our Supreme Court has recognized that the Legislature may enact an appropriations bill that transfers "a special fund reserve temporarily from one purpose to another" provided the transfer does not interfere "with the objects for which such fund was created." (*Daugherty v. Riley, supra,* 1 Cal.2d at p. 309.) Recently, this district Court of Appeal stated that "money in special funds [may] be loaned to shore up the General Fund," subject to the specified statutory conditions of Government Code section 16310: "exhaustion of the General Fund, no interference with the object for which the special fund was created, [and] return of the money as soon as feasible." (*California Medical Assn., supra,* at p. 1458.) In accordance with that principle, the court in *California Medical Assn.* upheld the legality of a 2008 budget bill loan of $6 million to the General Fund from a special fund regulating physicians. (*Id.* at pp. 1455–1466.)

In enacting the budget bills at issue here, the Legislature acknowledged the principle that interfund loans should not interfere with a fund's purpose. The 2002 budget bill authorized a loan from the Recycling Fund to the General Fund, set a date for repayment, and stated: "It is the intent of the Legislature that the repayment is made so as to ensure that the programs supported by this fund are not adversely affected by the loan." The 2002 budget bill also authorized the Director of Finance to transfer some of the loan proceeds back to the Recycling Fund during the 2002–2003 fiscal year as necessary to meet the Recycling Fund's cashflow needs, with all unused loan money reverting to the General Fund at fiscal yearend.[9] Similar statements were included in later budget bills authorizing loans from the Recycling Fund.

---

[9] The 2002 budget bill provides: "Upon written approval of the Director of Finance, funds from this loan shall be transferred back to the [Recycling Fund] in an amount necessary to provide operating funds for support of the [recycling program]. Once the monthly cashflow

Plaintiffs argue that these budget bill statements "expand the mandate contained in Government Code section 16310" setting limits on interfund loans. Government Code section 16310, subdivision (a) prohibits "any transfer that will interfere with the object" for which the Recycling Fund was created. Plaintiffs insist that the budget bill provisions set a more stringent standard that prohibits any transfer that "adversely affects" Recycling Fund programs. The argument differs from the position taken below by the Recycling Center Plaintiffs, where they asserted in their petition and supporting memorandum that the budget bills' statements were "consistent" with Government Code section 16310, rather than more expansive. The Chamber of Commerce Plaintiffs were vague on this point in their petition but they did assert in their supporting memorandum—in the closing footnote—that the budget bills' statements created a mandatory duty to ensure that the Recycling Fund programs were not adversely affected. That argument gained momentum on appeal, where all plaintiffs proposed in their briefing to this court that the budget bills impose a mandatory duty to ensure that the Recycling Fund programs are not adversely affected by the interfund loans. Plaintiffs are now united in asserting that the budget bill provisions go beyond Government Code section 16310's prohibition of interfund loans that interfere with a regulatory fund's purpose and prohibit any loan that "adversely affects" Recycling Fund programs. It is an argument largely ignored by the state, which concerns itself with demonstrating that the loans satisfy the standard articulated by Government Code section 16310.

At oral argument, counsel for the Recycling Center Plaintiffs suggested that the state's failure to offer a direct refutation of their claim that the budget bills imposed a mandatory duty apart from, and greater than, the duty imposed by Government Code section 16310 was a "waiver." There is no waiver. The state's position is, and always has been, that Government Code section 16310 sets the standard for the legality of interfund loans and that the loans at issue here satisfy that standard. That position is not forfeited by the state's failure to address an alternative standard proposed by plaintiffs. Nor do we accept the suggestion made at oral argument that plaintiffs are entitled to submit supplemental briefing on the question of whether the budget bill provisions created a mandatory duty more stringent than any duty imposed by Government Code section 16310. (Gov. Code, § 68081.) Plaintiffs raised the issue in their briefing on appeal and had a full opportunity to address it. (*People v. Alice* (2007) 41 Cal.4th 668, 677 [61 Cal.Rptr.3d 648, 161 P.3d 163].) The issue requires no additional briefing.

needs of the [recycling program] are met, any excess General Fund moneys transferred to the [Recycling Fund] during the 2002–03 fiscal year shall revert to the General Fund by June 30, 2003."

We conclude that the budget bills do not create a mandatory duty to ensure that Recycling Fund programs are not adversely affected by the interfund loans. Precatory statements of intent, like the ones contained in the budget bills, do not impose an affirmative duty enforceable through a writ of mandate. (*Shamsian v. Department of Conservation* (2006) 136 Cal.App.4th 621, 640–641 [39 Cal.Rptr.3d 62]; accord, *Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 444 [261 Cal.Rptr. 574, 777 P.2d 610].) Essential to the issuance of a writ of mandate is "[a] clear, present and usually ministerial duty upon the part of the respondent." (*Shamsian, supra*, at p. 640.) The budget bills' statement that "repayment is made so as to ensure that the programs supported by this fund are not adversely affected by the loan" is a general statement of intent, not the adoption of a clear and present duty to act in a particular manner. Similar statements of intent to repay loans are routinely included in budget bills. (See *California Medical Assn., supra*, 193 Cal.App.4th at p. 1452 [2008 budget bill provides for repayment " 'so as to ensure that the programs supported by the Contingent Fund of the Medical Board of California are not adversely affected by the loan' "].) No mandatory duty enforceable by a writ of mandate is created by such general statements in budget bills.

Even if some mandatory duty were extrapolated from these general statements in the budget bills, that duty must be read in light of Government Code section 16310. When read in the proper light, the budget bills' stated concern that the Recycling Fund not be adversely affected by the loans appears to be no more than an acknowledgement of Government Code section 16310's limitation on interfund loans that interfere with a fund's purpose rather than, as plaintiffs argue, a departure from the statutory standard to a stricter limitation on interfund loans.

Plaintiffs have also misread the budget bill provision that allows the Director of Finance to transfer some of the loan proceeds back to the Recycling Fund to meet the fund's monthly cashflow needs. This provision allowed for temporary transfers during the fiscal year covered by the budget bill with all unused loan money reverting to the General Fund at the end of the fiscal year. Effectively, the provision protected the Recycling Fund from month-to-month cashflow problems that could arise from a large lump-sum payment of the loan at the start of the fiscal year. The provision does not mandate transfers and does not apply beyond the relevant fiscal year.

The guiding standard is the one established by Government Code section 16310 and the cases interpreting its limitation on interfund loans. Plaintiffs' evidence of alleged adverse effects on Recycling Fund programs is therefore immaterial. The relevant question is whether the loans from the Recycling Fund interfered with the object for which the Recycling Fund was created. (Gov. Code, § 16310; *Daugherty v. Riley, supra*, 1 Cal.2d at p. 309.)

Recently, this district Court of Appeal was faced with a similar question when it considered whether a loan from the Contingent Fund of the Medical Board of California interfered with the object of the fund. The medical board licenses physicians, investigates complaints against physicians, and disciplines those found guilty of violating the law. (Bus. & Prof. Code, § 2004; *California Medical Assn., supra,* 193 Cal.App.4th at p. 1453.) The medical board collects license fees from physicians, which are held in the contingent fund and used to support the medical board's regulatory operations. (193 Cal.App.4th at p. 1453.) In the 2008 budget bill, the Legislature approved a $6 million loan from the contingent fund to the General Fund. (*Id.* at p. 1452.) An association of physicians challenged the legality of the loan with a petition for a writ of mandate directing that the money be returned. (*Ibid.*) Denial of the petition was affirmed on appeal. (*Id.* at p. 1466.)

The court rejected the plaintiffs' claim that the loan interfered with the object for which the special fund was created and held that the loan was authorized under Government Code section 16310. (*California Medical Assn., supra,* 193 Cal.App.4th at pp. 1455–1466.) In so holding, the court found no "evidence indicat[ing] that the loan in question has compromised the Medical Board's regulatory mission." (*Id.* at p. 1464.) The record showed that a surplus remained in the contingent fund after extending the loan to the General Fund, and a medical board budget analyst declared that the loan had no material effect on the medical board's ability to perform its statutory obligations of licensing physicians and enforcing the law. (*Id.* at p. 1455.) The court acknowledged that the loan may have resulted in physicians paying higher license fees because fees are statutorily set to provide a certain fund balance, and the loan reduced the fund balance. (*Id.* at p. 1459.) This effect, however, was not an interference with the *object* of the fund that would invalidate the loan, the court found. (*Ibid.*) The court reasoned that the fund was not created to set the amount of license fees but to regulate physicians— and that object was not impaired by the loan. "The Contingent Fund exists, broadly speaking, to enable the regulation of California physicians. Because the loan has not hindered performance of the Medical Board's regulatory responsibilities, it has not interfered with the purpose for which the Contingent Fund was 'created.' " (*Ibid.*)

The *California Medical Assn.* case is instructive in noting that not every negative impact occasioned by an interfund loan constitutes an interference with the object of the fund that invalidates the loan. A practical approach is necessary, one that protects regulatory operations while allowing the state sufficient "flexibility to balance its budget." (*California Medical Assn., supra,* 193 Cal.App.4th at p. 1465.)

## 2. *The Recycling Fund's regulatory mission was not compromised by the challenged loans*

The evidence here fails to show that the Recycling Fund's regulatory mission was compromised by the challenged loans. The Recycling Fund's regulatory mission, or object, is plain—to promote beverage container recycling. That object is clear from a reading of the detailed findings and statements of intent adopted by the Legislature when enacting the Recycling Act. (Pub. Resources Code, § 14501.) The Legislature found that "financial incentives and convenient return systems ensure the efficient and large-scale recycling of beverage containers," and expressed an intent "to encourage increased, and more convenient, beverage container redemption opportunities for all consumers" consisting of "dealer and other shopping center locations, independent and industry operated recycling centers, curbside programs, and other recycling systems that assure all consumers, in every region of the state, the opportunity to return beverage containers conveniently, efficiently, and economically." (Pub. Resources Code, § 14501, subd. (a).) The Legislature set "a beverage container recycling goal of 80 percent." (Pub. Resources Code, § 14501, subd. (c).)

When the writ petitions were filed, the funding cuts were still in place, and plaintiffs worried that continued loss of funding would drive recyclers and other program participants out of business. The Recycling Center Plaintiffs note that the Recycling Act aims "to enhance the profitability" of recycling centers and other recycling programs to provide consumers with convenient recycling opportunities. (Pub. Resources Code, § 14501, subd. (f).) Plaintiffs claimed that the Recycling Act, and the Recycling Fund it established, were being undermined by funding cuts that would cause recycling centers to fail in large numbers and leave consumers without places to redeem beverage containers for recycling. This dire situation did not materialize. Fortunately, the Legislature and Governor responded quickly to restore the Recycling Fund to solvency. There was, however, a temporary deficit, and that deficit compelled CalRecycle to implement a proportional reduction in processing payments, processing fee offsets, handling fees, curbside supplemental payments, and a host of other programs, from July 1, 2009, to December 31, 2009. It is this situation with which we are concerned.

Plaintiffs first observe that, absent the loans, there would have been no Recycling Fund deficit. This is true. The Recycling Fund made loans of $519 million between 2002 and 2009. Had that money remained in the Recycling Fund, the fund would have had a surplus in May 2009, not a projected deficit of $154.1 million. But it is not accurate to say that the loans in the 2002 to 2009 budget bills are responsible for the deficit. The case is not that simple.

The first loans had no adverse effect on the recycling program and its participants. In the budget bills of 2002 and 2003, the Recycling Fund and its subaccounts lent $352 million to the General Fund. The Recycling Fund balance remained high despite these loans. At the end of fiscal year 2003–2004, the Recycling Fund balance was over $83 million and grew to $214 million or more by the end of fiscal year 2005–2006. The loans did not cause a deficit.

In fact, a legislative concern in 2006 was the "[s]welling" and "persistent" Recycling Fund surplus and the Legislature considered (and took) "corrective action" with "the goal of increasing the rate of recycling, which would serve to bring down the fund balance to more reasonable levels" by increasing expenditures. (Legis. Analyst, Analysis of the 2006–07 Budget Bill: Dept. of Conservation (3480), *supra*, pp. 1, 4.) The Recycling Fund continued to have a surplus fund balance at the end of fiscal year 2007–2008. The fund balance at that time was over $306 million. It was under these circumstances that the September 2008 budget bill authorized a $32 million loan from the Recycling Fund to the Air Pollution Control Fund.

It is only after enactment of the 2009 budget bill that problems arose. As previously discussed, CalRecycle prepared forecast figures for the 2009–2010 budget that projected a surplus fund balance of $81 million. Based on that projection, the February 2009 budget bill approved loans from the Recycling Fund to the General Fund and the Air Pollution Control Fund. Unfortunately, CalRecycle's projection of a fund surplus for fiscal year 2009–2010 was wrong. As noted above, CalRecycle's forecast model was flawed and market changes led to an overstatement of the projected fund balance. The recycling rate rose from 61 percent in 2005 to 82 percent in 2009, surpassing the Recycling Act's goal of an 80 percent recycling rate. (Pub. Resources Code, § 14501, subd. (c).) At these recycling rates, expenditures outpaced revenue and the Recycling Fund experienced an operating deficit. To be sure, the loans from the Recycling Fund were a contributing factor to the Recycling Fund deficit, especially the 2009 budget bill loans. But, as the Legislative Analyst's Office reports, "[s]everal factors, working in combination," resulted in the Recycling Fund deficit. (Legis. Analyst, The 2010–11 Budget: Funding and Policy Options for the Beverage Container Recycling Program, *supra*, p. 4.) Those factors included loans from the Recycling Fund but also included declining beverage sales and increasing recycling rates. (*Ibid.*)

It is worth noting that, even to the extent that the loans did contribute to the Recycling Fund deficit, that effect was unintentional and unexpected. The Recycling Fund had a stated surplus each time the Legislature approved loans from the Recycling Fund to other funds. It is unfair to characterize the loans, as do the Chamber of Commerce Plaintiffs, as "a raid" on the Recycling Fund and to suggest that the Legislature undertook "creative financing schemes to benefit the General Fund" at the expense of the Recycling Fund. CalRecycle

had projected a Recycling Fund surplus when the Legislature enacted the 2009 budget bill loans and, when CalRecycle revised its estimate to project a deficit, the Legislature responded with emergency legislation that returned the Recycling Fund to solvency. (Stats. 2009, 8th Ex. Sess. 2009–2010, ch. 5.)

The Recycling Fund's insolvency did lead to funding cuts from July 1, 2009, to December 31, 2009. Overall, payments to recyclers were reduced by about 15 percent and beverage manufacturer processing fees were increased by around $50 million in the aggregate. We conclude that these funding cuts adversely affected recycling program participants, but we reject plaintiffs' claim that the cuts interfered with the object of the Recycling Fund to promote beverage container recycling.

We first note that the recycling rate did not decrease as a result of the 2009 funding cuts, contrary to the Recycling Center Plaintiffs' claim in their briefing on appeal. To support their claim of a drop in the recycling rate, plaintiffs cite a CalRecycle biannual report showing a lower recycling rate in the second half of 2009, when payment reductions were in effect, than in the first half of 2010. But the report covers only a portion of 2010. More recent figures show that the recycling rate was at an above-target rate of 82 percent in both 2009 and 2010, despite the reduced financial incentives occasioned by CalRecycle's temporary insolvency in the second half of 2009. (CalRecycle, State's Beverage Container Recycling Rate Matches All-Time High in 2010 <http://www.calrecycle.ca.gov/NewsRoom/2011/05May/06.htm> [as of Sept. 22, 2011].)

The Chamber of Commerce Plaintiffs argue that it is "simplistic" to focus on the recycling rate as an indicator as to whether the Recycling Fund is fulfilling its regulatory purpose. Plaintiffs note that the Recycling Act's statements of intent not only set a recycling goal of 80 percent but also avow that it is "[t]he responsibility" of "manufacturers, distributors, dealers, recyclers, processors" and CalRecycle alike "to provide convenient, efficient, and economical redemption opportunities" to consumers. (Pub. Resources Code, § 14501, subds. (c) & (g).) The Chamber of Commerce Plaintiffs argue that this responsibility has been unfairly shifted to manufacturers through increased processing fees. We reject the argument. CalRecycle implemented proportional reductions impacting all participants, not just manufacturers.

The impact on manufacturers was higher processing fees. Manufacturers paid more in processing fees when the Recycling Fund experienced a deficit because the processing fee offset, or subsidy, applies only when there are available funds. (Pub. Resources Code, § 14575, subd. (e)(1).) The effect of the deficit was to reduce the subsidies to the manufacturers so that manufacturers had to pay 65 percent of the processing payment given to recyclers (the

full statutory amount) instead of an average of 20 percent. Manufacturers still paid only a portion of the cost to mitigate the adverse effects of their operations, and CalRecycle paid the rest.[10]

In no sense did manufacturers assume sole responsibility for providing convenient recycling opportunities to consumers. All recycling program participants shared that responsibility. Although the reduction in subsidies to manufacturers (and payments to recyclers and others) was financially painful, the relevant issue in evaluating the lawfulness of interfund loans is not adverse effect upon program participants, but interference with the program's regulatory purpose. (*California Medical Assn., supra*, 193 Cal.App.4th at p. 1459.) Plaintiffs failed to show that the higher processing fees had a material impact on the recycling program as a whole.

For this same reason, we reject the Recycling Center Plaintiffs' dispute with funding cuts in curbside recycling supplemental grants, conservation corps grants, and similar programs. Plaintiffs have failed to link the funding cuts with impairment of the Recycling Fund's regulatory purpose. The curbside recycling programs, for example, are funded primarily through receipt of refund values for the containers they collect, and no evidence was presented that the curbside programs—and the recycling they promote—were appreciably damaged by the loss of supplemental grants.

The Recycling Center Plaintiffs next argue that interference with the object of the Recycling Fund is evidenced by the reduction in the number of convenience zone recycling centers, like the ones they operate. The president of Tomra Pacific, Inc. (Tomra), one of the Recycling Center Plaintiffs, submitted a declaration attesting to significant business losses as a result of the 2009 Recycling Fund payment reductions. Tomra is the largest operator of convenience zone recycling centers in California. The company's president states that Tomra closed 40 sites and laid off 67 employees as a result of the funding cuts. It is undisputed that the statewide number of convenience zones with recycling centers dropped from 2,142 in June 2009, before the funding cuts, to 2,071 in December 2009. Although the fact is undisputed, its significance is not.

Plaintiffs stress the importance of convenience zone recycling centers for easy container returns and maintain that the loss of 71 centers (a reduction of

---

[10] Properly understood, the manufacturers' processing fees were not increased as a result of the deficit—their subsidies were reduced. This fact defeats the Chamber of Commerce Plaintiffs' belated argument—not raised until appeal—that processing fees were increased as a result of the 2002 and 2003 loans in contravention of Government Code section 16320, subdivision (a) that set conditions for interfund loans for fiscal years 2001–2002 to 2003–2004. There is also the additional fact that these early loans did not create the 2009 deficit and loss of subsidies.

3.3 percent) was caused by the funding cuts and compromises the recycling program as a whole. CalRecycle counters that convenience zone recycling centers handle only about 25 percent of the used beverage containers recycled in the state, with most containers recycled through traditional recycling centers and curbside programs. CalRecycle also characterizes the 3.3 percent reduction in centers as "slight," and says the number of convenience zone recycling centers existing after funding cuts were implemented is in line with historical fluctuations in the number of centers. CalRecycle's operations manager declares that there were 2,030 convenience zone recycling centers in January 2007 when there was full funding, which is a number less than the 2,071 centers that existed in December 2009 after the funding cuts. Taking this long-term view, the operations manager opined that the funding cuts were not having a significant impact on the centers' operations. This evidence raises a serious question as to whether the funding cuts are to blame for the reduction in convenience zone recycling centers from June to December 2009.

Even if we accept the Recycling Center Plaintiffs' claim that the funding cuts did impact the operations of convenience zone recycling centers and caused a reduction in their numbers, the evidence as a whole does not show that the Recycling Fund's regulatory mission to promote beverage container recycling was compromised by the reduction. Convenience zone recycling centers, although an important part of the recycling program, are not the principal means of recycling. At least 75 percent of recycling is handled through traditional recycling centers and curbside programs. Also, the reduction in the number of convenience zone recycling centers was small—3.3 percent. Consumers therefore continued to have many avenues open to them for recycling. We acknowledge plaintiffs' point that the Recycling Fund is intended to make recycling convenient to consumers, but the small reduction in the number of one type of recycling opportunity is not proof that convenient recycling was lost. (Pub. Resources Code, § 14501, subds. (a) & (e).) On this record, we cannot say that the Recycling Fund's goal of promoting beverage container recycling was materially harmed by the budget bill loans that contributed to a fund deficit and funding cuts.

We recognize that convenience zone recycling center operators and their employees have suffered financial troubles, and we do not minimize their difficulties. But these are difficult times, and the Legislature must make difficult choices when balancing the budget during a recession. The Legislature must also, of course, make lawful choices—regardless of financial expediency. It is the judiciary's task to hold the Legislature to account on that matter. We have scrutinized the record and are satisfied that the Legislature acted lawfully here. The loans from the Recycling Fund did not interfere with the object for which the Recycling Fund was created and were therefore lawful. (Gov. Code, § 16310; *Daugherty v. Riley, supra,* 1 Cal.2d at p. 309.)

## IV. DISPOSITION

The order denying petitions for a writ of mandate is affirmed.

Reardon, Acting P. J., and Rivera, J., concurred.

A petition for a rehearing was denied October 20, 2011, and the petition of appellant Tomra Pacific, Inc., for review by the Supreme Court was denied January 4, 2012, S197650.